HARTFORD PRODUCTION CREDIT ASSOCIATION *vs.*
ARTHUR A. CLARK.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued April 5th—decided April 16th, 1934.

*Vine R. Parmelee,* for the plaintiff.

*D. J. Loughlin* appeared for the defendant but did not argue the cause.

HINMAN, J. In 1933 the General Assembly passed an Act (General Statutes, Cum. Sup. 1933, § 1110b) providing that "(a) Any person, association, partnership or corporation engaged in this State in the business of farming, or the raising, breeding, fattening or marketing of livestock may enter an agreement with and borrow funds from the reconstruction finance corporation, regional agricultural credit corporations, the secretary of agriculture of the United States, or any federal agency, including the United States of America, now or hereafter authorized to loan money to agricultural producers, and may give as security for such loan a note secured by a chattel mortgage upon livestock, farm machinery or farm equipment, or upon any crop or crops either planted or to be planted within one year from the date of the execution of such mortgage, or any extension thereof on lands within this State. Each such mortgage shall be a lien against the chattels and crops thereby conveyed, and shall be good and available in law against all subsequent purchasers or execution creditors, upon the recording thereof as hereinafter directed." It also provided: "(e) Unless otherwise expressly provided by such mortgage, the mortgagor shall be entitled to retain

possession of the mortgaged chattels and crops until default under the terms of his agreement; . . ."

The obvious purpose of the provision last quoted was to create, as to the mortgages provided for in the Act, an exception, additional to those already provided in §§ 5092 and 5094 of the General Statutes, to the general rule that retention of possession of mortgaged chattels invalidates the mortgage as to creditors and bona fide purchasers. *Safford* v. *McNeil,* 102 Conn. 684, 688, 129 Atl. 721; *Hartford-Connecticut Trust Co.* v. *Puritan Laundry, Inc.,* 95 Conn. 172, 180, 111 Atl. 149; *Gaylor* v. *Harding,* 37 Conn. 508; *Swift* v. *Thompson,* 9 Conn. 63; 11 C. J. p. 564. The effect of the Act is to preserve the validity, as to such third parties, of such mortgages, when given and recorded in compliance with it, notwithstanding that possession of the mortgaged property is retained by the mortgagor. The exception applies not only to mortgages so given to the secretary of agriculture and the corporations designated by name but also to those in which the mortgagee is "any federal agency . . . now or hereafter authorized to loan money to agricultural producers." The determinative question presented by this action and reserved for our advice is whether the plaintiff, The Hartford Production Credit Association, is such a "federal agency" within the meaning of § 1110b. This is a problem of statutory construction involving consideration of the terms of the Act as a whole and the circumstances and conditions existing at the time and which may be deemed to have affected its intent and motivated its adoption. *Pelton & King, Inc.* v. *Bethlehem,* 109 Conn. 547, 147 Atl. 144; *State* v. *Faro,* 118 Conn. 267, 171 Atl. 660.

The stipulation of facts discloses that at the time of the passage of the Act, which took effect June 9th, 1933, the only agencies providing funds for short term

credits from federal sources to agricultural producers on the security of personal property were the reconstruction finance corporation, the regional agricultural credit corporation, and the secretary of agriculture, all of which were specifically mentioned in the Act. The regional agricultural credit corporation of Albany, New York, which served this district, obtained its funds in the first instance from the reconstruction finance corporation. Soon after the passage of the Connecticut Act, Congress passed the "Farm Credit Act of 1933," approved June 16th, 1933, under which administration of the lending of funds to agricultural producers has been superseded by the organizations set up in that Act under the head of the farm credit administration. The primary purpose of this Farm Credit Act, as indicated by its title, was to provide for organizations, within the farm credit administration, to make loans for the production and marketing of agricultural products. To that end the governor of the farm credit administration, hereinafter referred to as the "governor," is authorized and directed to organize and charter twelve corporations to be known as "Production Credit Corporations" and twelve banks to be known as "Banks for Coöperatives," one such corporation and one such bank to be established in each city in which there is located a federal land bank, and is also authorized and directed to organize and charter corporations to be known as "Production Credit Associations." It is provided that the capital stock of each production credit corporation shall be in such amount as the governor determines is required for the purpose of meeting the credit needs of the district to be served by it. The initial capital stock shall be subscribed for by the governor and held by him on behalf of the United States, payment therefor to be made out of a revolving fund created by the

Act and consisting of unexpended balances and collections of various government appropriations for crop loans, seed loans, etc., formerly under the department of agriculture, together with direct appropriations by Congress. Each production credit corporation is authorized to invest its funds in stock of production credit associations and to subscribe and pay for Class A stock in each such association located in its district in amounts sufficient to maintain the amount of outstanding Class A stock equal, as nearly as may be, to twenty per centum of the volume of loans made or to be made by such association. The corporation may at any time require the association to retire and cancel stock held by the corporation therein if the association has resources available therefor.

A production credit association may be organized by ten or more farmers desiring to borrow money under the provisions of the Act and may be chartered by the governor upon approval by him of the articles of association. The governor has power, under rules and regulations prescribed by him, or by prescribing the terms of the charter of the association, or both, to provide for the organization, management and conduct of the business of the association, including the amount of its stock; to fix the territory within which its operations may be carried on, the method of election and appointment of and the compensation of directors, officers and employees, and the maximum amount of individual loans which may be made; to prescribe the conditions under which the stock may be retired; and to provide for the consolidation of two or more associations. He may at any time direct such changes in the charter as he finds necessary, and by-laws shall not be valid unless approved by him. The stock of such association is divided into shares of $5 each and is of two classes: Class A stock which is to

be held by the production credit corporations and which may be purchased and held by investors, and Class B stock which may be purchased only by farmer borrowers from the association and individuals eligible to become borrowers. Class B stock only is entitled to voting rights, each holder being entitled to one vote. No Class B stock may be transferred except to another farmer borrower or one eligible to become such, and each holder, within two years after ceasing to be a borrower, is required to exchange his holdings for Class A stock. During such time as any production credit corporation is a holder of any stock of an association, the appointment or election of directors, the secretary-treasurer, and the loan committee of such association, is subject to the approval of, and any officer may be removed by, the president of the production credit corporation. Each association is required to apply its earnings in excess of operating expenses, first, to making up any losses in excess of its reserve for bad and doubtful debts; second, to the restoration of the amount of impairment, if any, of capital; third, to the creation and maintenance of a reserve account for bad and doubtful debts in an amount prescribed by the production credit corporation; fourth, to the creation and maintenance of a guaranty fund which shall be invested subject to rules and regulations prescribed by the production credit corporation. Any sums remaining may, with the approval of the production credit corporation, be devoted to the payment of dividends. The association invests its funds and makes loans to farmers for general agricultural purposes under such rules, on such terms and conditions, at such rates of interest and with such security as may be prescribed by the production credit corporation. Associations are authorized to borrow from, and rediscount paper with, federal intermediate

credit banks subject to the restrictions, limitations and conditions applicable under the Federal Farm Loan Act (U. S. C., Title 12, Chapter 8) and, except with the approval of the governor, may not borrow from or rediscount paper with any other bank or agency. At least once each year each association is to be examined by examiners designated by the governor. The Act declares (§ 63) that the central bank for coöperatives and the production credit corporations, production credit associations, and the banks for coöperatives, organized under the Act, and their obligations, "shall be deemed to be instrumentalities of the United States" and their obligations are granted certain exemptions from taxation, with a proviso that the exemption shall not be applicable to any association or its property or income after the stock held in it by the production credit corporation has been retired.

The Production Credit Corporation of Springfield has been duly organized and chartered by the governor, as has also the plaintiff association. The Production Credit Corporation of Springfield is now the only holder of Class A stock of the plaintiff association and Class B stock is held by various farmer borrowers, the defendant, Clark, being the holder of one share. Pursuant to the authority granted it, the plaintiff has made a loan of $100 to the defendant for which he gave his promissory note and as security executed and delivered a mortgage on certain personal property, viz.: a tractor and two horses, owned by him and in his possession on his farm in Windsor. This mortgage has been duly recorded in the office of the town clerk. The use and possession of the chattels so mortgaged are necessary to the defendant for carrying on his farm operations and he has not delivered possession of them to the plaintiff. The mortgage itself provides "that until default . . . the mortgagor may remain in

possession of said property." In order that the plaintiff may obtain the benefit of rediscount privilege through the federal intermediate credit bank of Springfield, it is necessary that the security be acceptable to that bank, and it has refused to rediscount the note of Clark because of doubt as to whether the mortgage is a lien valid as against subsequent purchasers or execution creditors. The question giving rise to this doubt is whether the association is to be regarded as a "federal agency" within the scope of General Statutes, Cum. Sup. 1933, § 1110b. If so, the mortgage would be valid as against such purchasers and creditors notwithstanding retention of the mortgaged property by Clark.

The facilities for short term credits to agricultural producers afforded by the original action of the federal government and through subsequent passage of the Farm Credit Act of 1933 were in response to imperative needs for relief of this nature so extensive and acute as to be of general cognizance. There can be no doubt that the intent of the Connecticut enactment was to enable our farmers to avail themselves of those facilities by exempting the security for such loans from the prohibitive consequences of our laws as to the effect of retention of possession of mortgaged personal property. The terms of the Act were designedly made broad enough to include not only the then operating federal agencies but also such others as the Congress might provide to supplement or supersede them in furnishing this type of credits. The resumé of the elaborate provisions of the Farm Credit Act of 1933, which reasonable limitations of space permit us to give, and the admitted facts are sufficient to demonstrate that the plaintiff association is, in essence and in all practical aspects, a federal agency within the contemplation of our statute. It is, and could be, created only

under the Federal Act and is expressly declared therein to be an instrumentality of the United States; its operations are supervised and regulated in all material respects by other federal agencies and by federal officials, and the funds with which it may make loans are derived from federal sources and obtained through other instrumentalities of the United States. Such incidental features as the obviously remote possibility that Class A stock might be held by investors other than a production credit corporation or that the stock held by the latter might be retired, and the holding of Class B stock by borrowers, rigidly limited and circumscribed as it is, appear to us to be insufficient to deprive the association of status as a federal agency or to materially derogate therefrom, at least unless and until improbable developments above mentioned work a substantial departure from the nature of the association as at present constituted.

Therefore, in answer to the first question reserved (A), we advise that The Hartford Production Credit Association is a "federal agency" within the meaning of General Statutes, Cum. Sup. 1933, § 1110b, and as such entitled to the rights, powers, privileges, immunities and benefits thereof to the same extent as if it had been specifically named therein. The further questions concern the status as such a federal agency of (B) other production credit associations and (C) of any production credit corporation, central bank for cooperatives, or bank for coöperatives, which are not parties to this proceeding, and we express no opinion thereon further than as may be derived by necessary implication from the foregoing discussion.

No costs will be taxed in this court.

In this opinion the other judges concurred.