WATERBURY SAVINGS BANK *v.* CORNELIUS J. DANAHER, ADMINISTRATOR.

FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF MERIDEN *v.* CORNELIUS J. DANAHER, ADMINISTRATOR.

MALTBIE, C. J., AVERY, BROWN, JENNINGS and ELLS, JS.

Argued June 6—decided November 6, 1940. Reargued March 7, 1941—amendment to opinion filed June 4, 1941.

*Harry Silverstone*, assistant attorney general, with whom, on the brief, was *Francis A. Pallotti*, attorney general, for the appellant (defendant).

*William W. Gager*, for the appellee (plaintiff Waterbury Savings Bank).

*Harry R. Cooper*, for the appellee (plaintiff First Federal Savings and Loan Association).

BROWN, J. Each of these cases, which were tried together, is an appeal from the determination of the defendant as administrator of the Unemployment Compensation Act (Chapter 280a, Sup. 1939) in assessing contributions against the plaintiff. In the first case the plaintiff is a corporation located in Waterbury, organized and existing under the laws of this state, while in the second case the plaintiff is a corporation located in Meriden, organized and existing under the laws of the United States. While the facts in the cases also differ in certain other respects, the question as to whether the plaintiff is exempt from contribution under § 1334e (a) (5) (E), Sup. 1939 of the Unemployment Compensation Act, is determinative of each. The court ruled in each case that it is. We deal first with the case of the Waterbury Savings Bank.

The plaintiff bank is a state chartered mutual savings bank incorporated in 1933, the result of a merger of other state chartered mutual savings banks, the oldest of which had been in continuous operation since 1851. At all times since the enactment of the Unemployment Compensation Act on November 30, 1936, it has employed more than five persons and up to November 1, 1937, paid unemployment compensation contributions to the state as required under the act. On that date it was admitted into membership in the Federal Home Loan Bank of Boston, having previously applied for membership, and with the permission of the bank commissioner of this state as provided in § 1523c, Cum. Sup. 1935, subscribed to fourteen hundred shares of stock in that bank, representing an investment of $140,000. Shortly thereafter the plaintiff bank notified the defendant administrator of the fact that it had joined the Federal Home Loan Bank system and of its claim that it was now a federal

instrumentality and therefore no longer subject to the Unemployment Compensation Act. It thereafter paid no unemployment compensation contributions. During the period from November 1, 1937, to March 30, 1939, it was designated as exempt on the records of the administrator, but no notice thereof was sent to it. The administrator made no claim upon it for contributions until March 30, 1939, when he did demand them for this period, and upon its failure to comply made an assessment of $8257.20 with interest. Since becoming a member of the Federal Home Loan Bank of Boston the plaintiff has at no time exercised any of its membership privileges except that it did make deposits totaling $500,000 at interest. It has not been designated or employed as fiscal agent of the United States government.

The question for decision in the first case is whether a state chartered institution which has subscribed for stock and thereby becomes a member of the Federal Home Loan Bank is an instrumentality of the United States within the meaning of the exception set forth in § 1334e (a) (5) (E). The problem presented is one of "statutory construction involving consideration of the terms of the act as a whole and the circumstances and conditions existing at the time and which may be deemed to have affected its intent and motivated its adoption." *Hartford Production Credit Asso.* v. *Clark,* 118 Conn. 341, 343, 172 Atl. 266. We are called upon to "look beyond the literal meaning of the words to the history of the law, its language considered in all its parts, the mischief it was designed to remedy and the policy underlying it." *Chambers* v. *Lowe,* 117 Conn. 624, 626, 169 Atl. 912. The mischief which the act was designed to remedy was unemployment. Its adoption followed the report of a special commission appointed by the governor, predicated on exhaustive

study and investigation. *H. Duys & Co., Inc.* v. *Tone,* 125 Conn. 300, 307, 5 Atl. (2d) 23. This report stated as a reason for its recommendation that the law be enacted "the seriousness of the unemployment problem even in normal times, with the suffering that unrelieved unemployment causes, and the many objections to any other method yet devised of relieving the able-bodied unemployed, such as made work, or a dole based on need and subject to a showing of destitution." The act was adopted in consequence of the enactment of the federal social security acts, 42 U.S.C.A., § 501 et seq., § 901 et seq., § 1101 et seq., 49 U. S. Stat. at Large, pp. 626, 635, 639, and many other states have adopted similar acts. *Duys* case, supra, 304. It was designed to ameliorate the tragic consequences of unemployment. *Carmichael* v. *Southern Coal & Coke Co.,* 301 U. S. 495, 515, 57 Sup. Ct. 868, 81 L. Ed. 1245, 1257; *Buckstaff Bath House Co.* v. *McKinley,* 198 Ark. 91, 127 S. W. (2d) 802, affirmed 308 U. S. 358, 60 Sup. Ct. 279, 84 L. Ed. 242, 245; *Howes Bros. Co.* v. *Massachusetts Unemployment Compensation Commission,* 296 Mass. 275, 5 N. E. (2d) 720, 725; *Gillum* v. *Johnson,* 7 Cal. (2d) 744, 760, 62 Pac. (2d) 1037, 1044.

The provisions of the act disclose that pursuant to the plan effective under it, a fund is created by employers' involuntary contributions, out of which employees who lose their jobs may, after a waiting period, be paid benefits limited in amount and duration, while looking for work but unable to find it. Certain types of employers are excluded from the requirement to pay contributions. Benefits are paid only to employees as to whose wages contributions are payable by the employer. § 1338e (f). Therefore the benefits of the act are denied to employees engaged in the excepted employments. That the purpose of the act is remedial in character is clear. It is therefore to be construed

liberally as regards beneficiaries, in order to accomplish its purpose. *Powers* v. *Hotel Bond Co.,* 89 Conn. 143, 146, 93 Atl. 245; *Bradley* v. *Fenn,* 103 Conn. 1, 4, 130 Atl. 126. Furthermore, since the advantage of an exemption from this law of general application imposing a tax applying to employment generally is sought by the plaintiff, the rule requiring liberal construction in favor of the taxpayer is not applicable. *Allen* v. *Shelton,* 96 Fed. (2d) 102, 104. The case falls rather within the principle that exempting statutes are strictly construed and exempt only what is strictly within their terms. *Klein* v. *Bridgeport,* 125 Conn. 129, 131, 3 Atl. (2d) 675; *Woodstock* v. *The Retreat, Inc.,* 125 Conn. 52, 56, 3 Atl. (2d) 232; *Bickart* v. *Sanditz,* 105 Conn. 766, 772, 136 Atl. 580.

The restrictive effect of the exemption upon the remedy for the evil of unemployment contemplated by the act, emphasizes the importance of discovering the reason for this exemption in ascertaining the legislative intent in enacting it. The material portion of § 1334e (a) (5) (E), the provision in question, is: "No provision of this chapter . . . shall apply to any of the following types of service or employment: . . . service performed in the employ of the United States government, this state, any other state, any town or city, or any political subdivision or instrumentality of any of them." The term "federal instrumentality" or "instrumentality of the United States," as used in the decided cases, has been identified with the doctrine that such agencies are immune from state control, and has been used to describe a government agency which is immune from state control. It is accordingly a fair inference that this is the sense in which the legislature used the term here. This is fortified by circumstances attending the adoption of the act. The act was based upon a draft of a bill submitted with its report by the

special commission above mentioned, and the exceptions in this draft, including the one in question, conformed to its express recommendation that these "parallel the exemptions from tax in Section 907c" of the Federal Social Security Act. The Supreme Court of the United States has recently interpreted the purpose of this exemption in that act in these words: "The exclusion . . . from the scope of the Federal Act, and hence from the complementary state systems, emphasizes the purpose to exclude from this statutory system only that well defined and well known class of employers who have long enjoyed immunity from state taxation." *Buckstaff Bath House* v. *McKinley*, 308 U. S. 358, 364, 60 Sup. Ct. 279, 282, 84 L. Ed. 242, 245. Earlier, in considering the exception in the Alabama Unemployment Compensation Act, the court had said: "Fear of constitutional restrictions, and a wholesome respect for the proper policy of another sovereign, would explain exemption of the United States. . . ." *Carmichael* v. *Southern Coal & Coke Co.*, supra, 513. That the reason so indicated was the one motivating the exception here involved has also been held by the highest court in Kansas, North Carolina and Pennsylvania. *Capitol Bldg. & Loan Asso.* v. *Kansas Commission of Labor & Industry*, 148 Kan. 446, 452, 83 Pac. (2d) 106; *Unemployment Compensation Commission of North Carolina* v. *Jefferson Standard Life Ins. Co.*, 215 N. C. 479, 482, 2 S. E. (2d) 584; *Unemployment Compensation Commission of North Carolina* v. *Wachovia Bank & Trust Co.*, 215 N. C. 491, 494, 2 S. E. (2d) 592; *Fidelity-Philadelphia Trust Co.* v. *Hines*, 337 Pa. 48, 10 Atl. (2d) 553, 556. No other reason for this exception has been judicially accepted. As applicable to the Connecticut act, therefore, we are led to agree with what the court said of the Kansas act in the *Capitol Bldg. & Loan Asso.* case,

supra, 447: "We think it clear that in the enactment of our statute . . . the legislature had no thought of enlarging the existing exemptions . . . which were and are the right and privilege of federal instrumentalities. The statutory provision concerning exemption of federal instrumentalities from taxation was merely declaratory of existing law." Our conclusion finds further support in the decision of this court that the legislature had a similar purpose with relation to an analogous situation, in exempting national banks from the operation of the state usury statutes. *State v. Hurlburt,* 82 Conn. 232, 233, 72 Atl. 1079. Cf. *Farmers & Mechanics National Bank* v. *Dearing,* 91 U. S. 29, 34, 23 L. Ed. 196, and *Griffith* v. *Connecticut* (83 Conn. 1, 74 Atl. 1068) 218 U. S. 563, 569, 31 Sup. Ct. 132.

The practical effect of holding otherwise confirms this conclusion, for it would impute to the legislature an intention to unreasonably and arbitrarily discriminate against the employees of the plaintiff bank, and also against all mutual savings banks of the state not members of the Federal Home Loan Bank. The finding shows that when the act was adopted, of the sixty-six savings banks in the state, but two were members of the Federal Home Loan Bank. The employees of these two are no less subject to the risk of unemployment and no less dependent upon their wages for the necessities of life than are those of the other sixty-four, but if the act were construed to exempt these member banks, the protection assured by it to the employees of the other banks would be denied them. Again, these sixty-four banks were in competition with the two member banks, which for all other purposes remained subject to all banking regulations. § 1523c. To construe the act as exempting the member banks would relieve them of the burden of contributing im-

posed by the act upon the sixty-four competing banks, as well as point the way for others to avoid payment of such contributions. It is not to be presumed that the legislature intended such discrimination in either respect. Practical reasons as well as authority support the conclusion which we have adopted. In such a case "the general rule should be construed broadly and the exception narrowly." *DeCarli* v. *Manchester Public Warehouse Co.,* 107 Conn. 359, 364, 140 Atl. 637. The situation is aptly summarized by these words of the Pennsylvania court: "When there is borne in mind the purpose of the Unemployment Compensation Law, . . . it is practically impossible to believe that the legislature intended to exempt banks and trust companies from the operation of the act except in so far as it was constitutionally compelled to do so." *Fidelity-Philadelphia Trust Co.* v. *Hines,* supra, 53.

The plaintiff bank contends that the construction we have adopted, predicated on the legislature's intent to have the exemption apply only to those federal instrumentalities which are constitutionally immune from state taxation, is unsound because the use of the word "contributions" in the act indicates these are not taxes, and further because they are not "to be used for public or governmental purposes" (61 C. J. 68, 69) in the usual sense of being paid into the public treasury, but instead, under the act, constitute a separate unemployment insurance fund. In view of the extent of the unemployment problem and the purpose and method of the act to meet it, the enactment is one clearly within the state's police power exercised in pursuance of "public . . . governmental purposes." In referring to a statute establishing a fund by contributions exacted from employers for the payment of workmen's compensation, which the state court had sustained as within the police power and also as possessing the char-

acteristics of a license tax, the Supreme Court of the United States said: "And the Federal Constitution does not require a separate exercise by the States of their powers of regulation and of taxation. *Gundling* v. *Chicago,* 177 U. S. 183, 189 [20 Sup. Ct. 633]." *Mountain Timber Co.* v. *Washington,* 243 U. S. 219, 237, 37 Sup. Ct. 260. Neither the fact that the payments required of employers under it are termed "contributions," nor that these payments when received are segregated in a separate fund to be applied to the purposes of the act, renders them any the less taxes. That the legislature regarded them as such is indicated by its action in expressly conferring upon the administrator all of the powers of a tax collector to insure their collection (§1345e), and as was said by the court of the Arkansas act, "that the required payment is referred to in our Act 155 as a 'contribution' is of no significance. It is compulsory contribution, and therefore a tax." *Buckstaff Bath House Co.* v. *McKinley,* 198 Ark. 91, 99, 127 S. W. (2d) 802. See also *Carmichael* v. *Southern Coal & Coke Co.,* supra, and *In re Mid America Co.,* 31 Fed. Sup. 601, 604.

It remains to determine whether under the interpretation which we have adopted, the plaintiff bank was an instrumentality of the United States within the exemption of § 1334e (a) (5) (E). This involves consideration of the federal legislation relative to federal home loan banks. These were organized under the Federal Home Loan Bank Act, 12 U. S. C. A., Chap. 11, §§ 1421-1449, adopted in 1932. This provided for a federal home loan bank board. The Federal Home Loan Bank of Boston is one of the several banks created by the board to serve respectively each of the districts established throughout the country. Originally these banks were created (1) to rediscount mortgages of member institutions, and (2) to make direct

loans to home owners. This second function, however, by the enactment of the Home Owners' Loan Act of 1933, was taken from the home loan banks and delegated to other agencies under the board. Membership in the individual federal home loan banks is open to all institutions which meet the conditions prescribed in § 1424 of the act, and which subscribe for stock in an amount equal to 1 per cent of the aggregate of the unpaid principal of the subscribers' home mortgage loans, but not less than $500. § 1426. This stock shares in dividend distribution. § 1426k. Membership entitles the institution to borrow against proper and adequate security in an amount not to exceed twelve times the amounts paid in for this stock held by it, and stock being subject to a lien to the bank for all indebtedness. §§ 1426(c), 1430(c). The latter is authorized to receive deposits. § 1431(e). Every institution applying for advances is required, as a condition precedent, to consent to such examination as the bank or board may require and that reports of examinations by constituted authorities may be furnished by them to the bank or the board upon request. § 1442(b). The Federal Home Loan Bank, except as to its real estate, is exempt from all taxation by any state taxing authority. § 1433. No such exemption is accorded the member institutions. An amendment in 1934 provided that when designated, any member institution may be employed as a fiscal agent of the government under regulations prescribed, "and shall perform all such reasonable duties as fiscal agent of the Government as may be required by it. Any . . . member of any Federal Home Loan Bank may act as agent for any other instrumentality of the United States when designated for that purpose by such instrumentality of the United States." § 1464k.

It is apparent from these pertinent provisions of the

federal statutes that the Federal Home Loan Bank of Boston is a federal instrumentality controlled by the federal home loan board. § 1427. It is further evident therefrom that the plaintiff bank as a member of the Boston bank does not ipso facto become an instrumentality of the United States. No intention of Congress to employ the member institutions as agencies to carry out any essential governmental functions is disclosed. Such financial assistance to the individual home owner as Congress deemed the federal government should furnish, was originally to be rendered directly by the federal home loan banks and not indirectly through their member institutions. Subsequently upon the repeal of this provision and the substitution of other agencies, the federal home loan banks became banks solely for rediscount, or bankers' banks. Their governmental function thereafter was confined to providing a credit reserve for institutions of satisfactory financial standing. This analysis of the Federal Home Loan Bank Act reveals that of the two functions which in the judgment of Congress it was necessary for the United States government to perform (1) to aid distressed banks and other financial institutions in the home mortgage field, and (2) to aid distressed home owners, the Federal Home Loan Bank of Boston is now performing the first only. It is the plaintiff, a financial institution which has elected to take advantage of the act, as distinguished from individual borrowers from it, which is the object of concern to the government, acting through the Federal Home Loan Bank of Boston. It is therefore manifest that under the law the plaintiff is a beneficiary and not an instrumentality of the United States government.

That the provision of § 1464k referred to, makes the plaintiff a potential fiscal agent of the United States government subject to the duties incident thereto, is

insufficient of itself to make it a federal instrumentality. It was in effect so held as to joint stock land banks which are subject to a similar provision (12 U. S. C. A., § 701), of which banks the court said: "There is nothing in their organization and powers to suggest that they are government instrumentalities." *Federal Land Bank* v. *Priddy*, 295 U. S. 229, 234, 55 Sup. Ct. 705, 79 L. Ed. 1408. The plaintiff bank's contention that the words in § 1464k, a "member of any Federal Home Loan Bank may act as agent for any other instrumentality of the United States," necessarily imply that it as a member is such an instrumentality, is without merit. The context makes clear that the words quoted do not refer to instrumentalities of the United States in contradistinction to the plaintiff, but in contradistinction to the federal home loan bank which is a federal instrumentality. Neither these nor the other arguments advanced by the plaintiff bank warrant the interpretation that the exemption applies to "all instrumentalities, whether essential or non-essential, whether governmental or proprietary" as claimed in its brief. Nor do they afford convincing reason for rejection of the interpretation we have adopted. The plaintiff bank is not an instrumentality of the United States government within the exemption, but is rather a corporation of this state subject to possible utilization should occasion arise, to serve the limited federal purposes specified. The *Capitol Bldg. & Loan Asso.* case, the two *Unemployment Commission of North Carolina* cases, and the case of *Fidelity-Philadelphia Trust Co.* v. *Hines,* supra, constitute express authority for this conclusion. See also *Federal Compress & Warehouse Co.* v. *McLean,* 291 U. S. 17, 23, 54 Sup. Ct. 267; *Fidelity & Deposit Co.* v. *Pennsylvania,* 240 U. S. 319, 323, 36 Sup. Ct. 298.

Because of its conclusion that the plaintiff bank was

exempt under the act, the trial court did not rule upon its alternative claim that in no event could it be required to pay contributions for the period from November 1, 1937, to March 30, 1939. As a result of our decision it is liable for such payments unless the administrator's conduct in treating it as exempt during that interval is effective to discharge this liability. On November 1, 1937, as already stated, the plaintiff bank was admitted into membership in the Federal Home Loan Bank of Boston, notified the defendant of this fact and of its claim that it was therefore no longer obligated to pay unemployment compensation contributions, made no such payments thereafter, and until March 30, 1939, was designated as exempt on his records. On March 30, 1939, for the first time the defendant demanded contributions of the plaintiff for the period in question and upon failure to comply made an assessment. The question for determination is whether the defendant is liable for this assessment, the amount of which is not in dispute.

The right of the defendant as an administrative official to change his decision for due cause, in so far as concerns a change restricted to the assessment of contributions to fall due for some period in the future, is not involved in the present inquiry, and if it were would not be open to question; *Middlesex Theatre, Inc.* v. *Hickey,* 128 Conn. 20, 22, 20 Atl. (2d) 412; and upon the situation shown by this record the attorney general's advice would constitute such cause. The vital inquiry in the present case is whether such a change can be given retroactive effect. The serious practical objection to holding that it can is obvious. To so decide would mean that the defendant by changing his ruling after the lapse of a long period of years, during which the plaintiff had gone upon the assumption that it was exempt, could suddenly impose upon

it the necessity of paying the back contributions for these years with the unwarranted hardship which that would involve. This is not a result which commends itself, and it should be avoided if this is possible and in consonance with sound legal principles. The desired outcome cannot be supported, however, upon the theory that the defendant's act in granting exemption to the plaintiff originally as he did, amounted to a decision which, under the rule of res adjudicata, could not later be reversed. That doctrine is not applicable to the defendant's action as an administrative official in this case, but relates only to decisions rendered by a court of competent jurisdiction. 30 Am. Jur., Judgments, § 164. See *Ruocco* v. *Logiocco,* 104 Conn. 585, 595, 134 Atl. 73. Nevertheless, it is true that a broad ground of public policy underlies this doctrine. *Wildman* v. *Wildman,* 70 Conn. 700, 706, 41 Atl. 1. Recognizing this as also the underlying reason in the case of administrative rulings, although the doctrine of res adjudicata was not applicable, we have not hesitated upon grounds of public policy to curb the right of an administrative board to change its decision. See *St. Patrick's Church Corporation* v. *Daniels,* 113 Conn. 132, 137, 154 Atl. 343; *Burr* v. *Rago,* 120 Conn. 287, 292, 180 Atl. 444, and *Rommell* v. *Walsh,* 127 Conn. 272, 276, 16 Atl. (2d) 483. Where it appears that it is against public policy that an administrative officer should change a decision with retroactive effect, it is the court's right and duty to curb his powers so as to serve that policy. It has accordingly been held that the interstate commerce commission could not retroactively change an order affecting rates. *Arizona Grocery Co.* v. *Atchison Ry.,* 284 U. S. 370, 389, 52 Sup. Ct. 183. See also for a general discussion of this principle, 49 Yale Law Journal 1250, et seq., and cases cited.

Section 1345e which empowers the defendant administrator to collect contributions from employers, expressly provides in subsection (c) that in the event of an under-payment of the contribution due from an employer, it "shall be paid by the employer to the administrator at such time as the administrator shall prescribe." This provision is only applicable, however, where the employer has made a return pursuant to other provisions of that section, in which return there is an error. It therefore does not affect the question to be determined on the record before us. While to hold the administrator's decision on the question of exemption absolutely irrevocable, might well in some cases defeat the purpose of the act, on the other hand as already suggested it is important that his unchallenged decision, until rescinded or superseded by further action upon his part, should be recognized as valid and effective. It is highly desirable that so much assurance be afforded the contributor and that certainty within these limits be accorded the official action of the administrator. We therefore conclude, under the principle enunciated in the preceding paragraph, that the plaintiff is not liable for the assessment for the period from November 1, 1937, to March 30, 1939. The court properly excluded evidence of what the governor's commission "considered" in preparing its report, claimed by the defendant as bearing upon the question of legislative intent. *Litchfield* v. *Bridgeport,* 103 Conn. 565, 573, 131 Atl. 560. The court erred in holding that the plaintiff bank is entitled to exemption under the act.

In the second case the following material facts are undisputed. The plaintiff association was organized as a savings and loan association in 1901 under the laws of this state. In 1933 while operating as a state chartered institution it became a member of the Federal

Home Loan Bank of Boston. On February 24, 1936, it was converted into a federal savings and loan association and since then has operated under and pursuant to a charter granted by the federal home loan bank board acting under authority of the Home Owners' Loan Act of 1933. The principal business of the plaintiff association is receiving share accounts from members and loaning funds on the security of long-term first mortgages on real estate. Prior to its conversion into a federal savings and loan association, it was under the jurisdiction of the banking department of this state. Since its conversion it has been subject to the supervision of and examination by the federal home loan bank board of Washington only. The plaintiff association is obliged to and does furnish to the Boston bank monthly reports of the amounts of business transacted in both its savings and loaning divisions, monthly reports of its assets and liabilities, semi-annual reports of earnings, and annual reports of its operations. The Boston bank, as previously stated, is organized under the Federal Home Loan Bank Act as one of the twelve regional banks comprising the federal home loan banking system of the United States government. This system is one of the three separate agencies administered by the federal home loan bank board, of which the other two are the Federal Savings and Loan Insurance Corporation and the Home Owners' Loan Corporation. The plaintiff association, as required, has purchased in the aggregate two hundred fifty-six shares of the stock of the Federal Home Loan Bank of Boston in the total of $25,600. The Home Owners' Loan Corporation is the owner of four thousand of the investment shares of the plaintiff association of the aggregate par value of $400,000. The plaintiff association has been approved by the Federal Savings and Loan Insurance Corporation for insurance

of the accounts of its members and investors and has become insured under the National Housing Act. 12 U. S. C. A. §§ 1703, 1707 et seq. It has also been approved by the federal housing administration to act as a mortgagee under the provisions of that act. Prior to its conversion into a federal savings and loan association the plaintiff association was unable to establish a line of credit upon a long-term basis equal to that provided in the mortgage notes which it offered as collateral security. From the time of its organization as a federal association it has, on the security of its mortgage notes as collateral, borrowed from the Federal Home Loan Bank of Boston $295,500 in the aggregate upon the long-term basis. On May 26, 1937, the plaintiff association submitted to the defendant administrator its employer's status report claiming exemption under the Unemployment Compensation Act as an instrumentality of the United States government. The administrator ruled that it was entitled to the exemption, and under circumstances similar to those of the first case made no demand upon it until May 18, 1939, when, upon its failure to make reports or pay contributions, he made an assessment against it of $319.09 with interest, for the period from January 1, 1937, to March 31, 1939, which it refused to pay.

The question for decision is whether a federally chartered savings and loan association and member of a federal home loan bank is an instrumentality of the United States within the meaning of the exception set forth in § 1334e (a) (5) (E). A brief review of the chief financial systems or agencies created by Congress for the discharge of certain functions of the federal government affords an enlightening approach to the determination of this question. It established the national banking system in 1864, providing among other things for the regulation of the value of money, bor-

rowing by the government, and the creation of the fiscal agencies required. In 1913 it instituted the federal reserve system. This, in conjunction with the national banking system, provided a coordinated field of financial corporations to serve commerce and industry. By the Federal Farm Loan Act of 1916 it established the federal land banks, joint stock land banks and national farm loan associations, to facilitate financial credit to farmers by long-time amortized loans on the security of farm land, affording a complete banking system for agriculture under the farm credit administration. Finally came the expansion of the national system of financial corporations by provision for a system of home mortgage banks to serve the field of home financing under the Federal Home Loan Bank Act of 1932. This was to meet the need for an agency to serve the small home owner, as the federal reserve system serves commercial interests, and the federal farm loan system supplies credit to the farmer. The system of twelve federal home loan banks under this act was intended to serve as a long-term credit reserve to the then-existing home-financing institutions. When it appeared that this system was not adequate to meet the exigencies of the depression affecting home financing, Congress adopted the Home Owners' Loan Act of 1933. The Home Owners' Loan Corporation was also created in 1933 as an emergency agency to meet the immediately existing collapse in the home-financing field. By § 5 of the act the system of federal savings and loan associations which it created, and the Home Owners' Loan Corporation, were authorized to grant direct loans to home owners in place of the federal home loan banks, whose power in this respect was repealed. These federal savings and loan associations were created also to act as fiscal agents of the government, to increase the market for obligations of the

United States, and to assist the government in providing for the general welfare by providing local thrift institutions in which people might invest and for financing homes. In 1934 Congress passed the Bank Deposit Insurance Act, establishing the Federal Deposit Insurance Corporation to insure deposits in banks up to $5000. Similarly in the field of long-term home financing the Federal Savings and Loan Insurance Corporation was created to insure the investments up to $5000 of savers in home financing institutions.

This resume demonstrates how Congress has from time to time, as it deemed conditions required, extended the federal system of financial institutions by creating such further corporations as it deemed necessary. This it finally exemplified in the field of home financing by taking care of that urgent national need for which it had theretofore made no provision. It is unquestioned that the federal home loan banks are instrumentalities of the United States. In view of the circumstances under which the act creating the system of federal savings and loan associations was adopted, the purpose intended to be served, and the provisions enacted concerning them as above set forth, particularly that granting to them in place of the federal home loan bank to which formerly it was solely entrusted, the power to grant direct loans to home owners, it is evident that these savings and loan associations also are instrumentalities of the United States. This finds corroboration in the federal charter issued to the plaintiff association in provisions, among others, that it may "lend its funds on the security of first liens upon homes," that it "shall act as fiscal agent of the Government when designated for that purpose by the Secretary of the Treasury . . . and shall perform all such reasonable duties as fiscal agent of the Government as he may require," and that it "may act as agent

for any other instrumentality of the United States when designated for that purpose by any such instrumentality." It is further evidenced by the object of the association as expressed in its charter "to promote thrift . . . and to provide for the sound and economical financing of homes."

Support is found for this conclusion in cases which have been decided. In the somewhat analogous case of a national farm loan association organized under the Federal Farm Loan Act above referred to, the court specifically held such an association to be·an instrumentality of the federal government. *Knox National Farm Asso.* v. *Phillips,* 300 U. S. 194, 202, 57 Sup. Ct. 418. The court in *First Federal Savings & Loan Association* v. *Loomis,* 97 Fed. (2d) 831, at page 837, points out that pursuant to the provision of the Federal Home Loan Act requiring federal savings and loan associations to serve as fiscal agents of the United States, they have already been called upon to act as such fiscal agents to sell United States savings bonds to their members, to collect delinquent accounts arising out of insurance and loan transactions of the administrator under the National Housing Act, to make investigations and reports concerning delinquencies as described by the administrator, and to service loans and properties for the Home Owners' Loan Corporation. They are also subject to being called upon as fiscal agents to perform other duties, as for example, conducting bond selling campaigns for the government, or serving as government depositaries. Under the Federal Farm Loan Act above referred to, the existence of the power of designating federal farm loan banks as fiscal agents of the government, even though not exercised, is sufficient to sustain the act. *Smith* v. *Kansas City Title & Trust Co.,* 255 U. S. 180, 210, 41 Sup. Ct. 243. Accordingly, by virtue not only of the duties which

already have been imposed upon the plaintiff association as fiscal agent under the Federal Home Loan Act, but also because of those which legally may be required of it in the future, it is constituted an instrumentality of the United States. For the reasons above stated we conclude that the plaintiff association is an instrumentality of the United States within the meaning of the exception set forth in § 1334e (a) (5) (E), Sup. 1939. Since the constitutionality of the Home Owners' Loan Act under which the plaintiff association was created is not attacked, we assume it to be constitutional.

The extent to which the plaintiff association is identified with and tied into the federal system, independently of the fact of the nature and purpose of its incorporation, is indicated by these facts already referred to, viz: sole supervision is by the federal home loan bank board of Washington; regular reports must be made to the Federal Home Loan Bank of Boston; $400,000 of the Home Owners' Loan Corporation is invested in its capital stock; it has been approved by the federal housing administration to act as a mortgagee under the National Housing Act; it has borrowed of the Boston bank an aggregate total of $295,500 upon the security of mortgage notes for loans made by it; the accounts of its members are insured by the Federal Savings and Loan Insurance Corporation as required by the National Housing Act; and the mandatory provision of its charter constitutes it a fiscal agency of the United States. Although the plaintiff savings bank, like the plaintiff association, is a member of and an owner of capital stock of the Federal Home Loan Bank of Boston, none of the facts just recited hold true of the plaintiff bank. The factual distinction between the two plaintiffs as to these significant attributes, powers and methods of operation, is as clear as is the legal distinction implicit in their diverse origin. The court did

not err in holding that the plaintiff association is entitled to exemption under the act.

There is error in the first case and judgment is directed in accordance with the opinion. There is no error in the second case.

In this opinion the other judges concurred.