MANUEL P. ALMADA ET AL. *v.*
ADMINISTRATOR, UNEMPLOYMENT COMPENSATION ACT ET AL.

SUPERIOR COURT     HARTFORD COUNTY     FILE NO. 85900

Memorandum filed April 6, 1950

*Gordon, FitzGerald & Riley,* of Hartford, for the Plaintiffs.

*Shipman & Goodwin, William L. Hadden,* Attorney General, and *Harry Silverstone,* Assistant Attorney General, all of Hartford, for the Defendants.

ALCORN, J. The General Ice Cream Corporation, Bryant and Chapman and R. G. Miller divisions, hereinafter referred to as the employer, appeals from an award of unemployment compensation benefits to the plaintiffs, hereinafter referred to as the employees. The appeal assigns error in the conclusion that the employees were eligible for compensation because their unemployment was due to a lockout, in the conclusion that the employees were not ineligible for compensation because their employment was due to a labor dispute, and in the commissioners' refusal to correct the finding.

The finding contains twenty-six paragraphs. The employer seeks to add twenty paragraphs, and to correct four and delete one of the paragraphs as found. The employees, in turn, made a motion to add or substitute nineteen paragraphs. The commissioners refused to correct the finding as requested by either party and the employer having appealed, the employees, in an "Answer to Reasons of Appeal," deny the reasons assigned by the employer; and affirmatively allege that the commissioners erred in deciding that the unemployment was due to a labor dispute and in refusing to correct the finding as requested by the employees.

Both parties are chargeable with "one of those wholesale attacks on the finding which have been so frequently criticized." *Staff* v. *Hawkins,* 135 Conn. 316, 318. Although such an attack becomes "immediately suspect" it must, nevertheless, be considered. *Conte* v. *Egan,* 135 Conn. 367, 369.

With one exception, the corrections sought are claimed to be admitted or undisputed facts and they are accompanied by excerpts from the testimony allegedly supporting them. An admitted fact partakes of something in the nature of a judicial admission. *King* v. *Spencer,* 115 Conn. 201, 204. The mere fact that testimony was given, even though not expressly contradicted, does not necessarily make the fact testified to an admitted or undisputed fact because the commissioners were entitled to disbelieve witnesses or accord testimony a construction different from that asserted by the party advancing it. *Searle* v. *Gerent,* 114 Conn. 671, 674; Practice Book § 353. The

function of this court in correcting the finding is narrow and does not permit of resolving conflicting testimony or weighing evidence. Practice Book §§ 256, 265A; Conn. App. Proc. § 92; *Palumbo* v. *George A. Fuller Co.*, 99 Conn. 353, 355; *Bailey* v. *Mitchell*, 113 Conn. 721, 725.

The parties are in accord that the first sentence of paragraph 25 of the finding is not supported by the evidence and should be eliminated. The corrections sought in 5 (a), 6 (a) and 14 (a) of the employer's motion to correct, while not strictly essential, serve to set forth the material part of the language, rather than a synopsis, of letters referred to in the finding, and are added so that the precise text may appear. The other corrections, by whichever party sought, are either not admitted or undisputed facts or would not, if made, affect the result, and consequently are denied. *Tortorici* v. *Moosop, Inc.*, 107 Conn. 143, 144.

The significant facts from the finding, as corrected, are that the employer is subject to the Connecticut Unemployment Compensation Act, is engaged in processing and distributing milk and milk products, and the employees are its drivers or plant employees. The employees are members of a union which, on June 12, 1947, entered into two written employment agreements with the employer, identical in substance. The contracts provided that they should be effective for one year from February 1, 1947, that neither party could reopen or change any provision thereof prior to February 1, 1948, and that the agreements should be automatically renewed on expiration unless either party gave the other written notice to terminate on or before January 1, 1948. It was further provided that failure to give such notice would indicate a desire to renew the contract at expiration; and that if either party wished to change any provision at renewal it should submit its proposal on or before midnight January 1, 1948. Differences or disputes which could not be resolved by the parties were to be submitted to arbitration and in the event of any failure to agree on hours and/or rates of pay, including arbitration thereof, before the date of expiration of the agreements, any subsequent agreement would be retroactive to the expiration date.

On November 28, 1947, the employer wrote the employees' union, in substance, that the existing contracts were not satisfactory and suggested changes upon which it expressed hope that agreement could be reached by February 1 1948. The letter included a declaration that "If no agreement can be

reached by that date we shall consider that our present contract is terminated as of January 31, 1948," and "If an agreement is reached subsequent to February 1, 1948, such agreement shall be effective upon the date of agreement."

On December 26, 1947, the employees' union wrote the employer giving notice that it proposed "certain revisions to be effective February 1, 1948," and from January 1 to February 29, 1948, the parties conferred unsuccessfully on the various changes proposed by both sides.

On February 23, 1948, the employees' union, following the custom of previous years when a contract was under negotiation, voted to authorize a strike at the discretion of the union executive board. The employer received notice of this the next day and thereupon it imported some two hundred and fifty employees from its other areas and these began, on March 1, 1948, to accompany the regular employees on their routes in order to become familiar with the latter's duties preparatory to carrying on operations in the event of a strike.

On March 1, 1948, the employer also notified the employees' union that it no longer considered itself bound by the contract because of failure to agree. On the same day the employer notified its employees that "because of the failure to reach an agreement we will not be bound by the previous contract," and that, while it did not intend to change rates of pay, hours, or working conditions it would hire any necessary help to fill vacancies and would make no further deductions from pay for union dues, initiation fees, etc.

Following these communications the union met that evening and voted to strike rather than continue to take employer's imported employees out on the trucks. The meeting ended about 11:30 p. m. and drivers on wholesale routes reported and took their trucks out as usual at 2 a. m. on March 2. In the early morning hours of that day some of the imported employees were observed upon the employer's premises where they apparently had been given sleeping accomodations and where coffee was being made and other preparations completed for them to go on the route with the members of the employees' union.

At 5 a. m. on March 2 the employees' union picketed the employer's premises and the members ceased to report for work. That day the employer issued separation slips to the employees

indicating that the latter had left voluntarily and the following day, March 3, 1948, the employer advertised for applicants for steady, year round jobs.

Two days later, on March 5, 1948, the employees' union offered to arbitrate and return its men to work but the employer refused because it had hired new permanent replacements. On April 7, 1948, the employees' union submitted all issues between the parties to the state board of mediation and arbitration but the employer refused to arbitrate claiming that no agreement existed requiring it to do so. The union brought an action and this court (*Mellitz, J.*) on July 21, 1948, directed the employer to arbitrate under the contract between the parties which was held to be still effective.

Finally, on November 4, 1948, the parties reached an agreement settling their dispute. The employees claim unemployment compensation for the period from March to November, 1948, during which the events previously recited occurred.

The applicable statute is § 7508, General Statutes, which provides, in part, as follows: "An individual shall be ineligible for benefits . . . (3) during any week in which it shall be found by the administrator that his total or partial unemployment is due to the existence of a labor dispute at the factory, establishment or other premises at which he is or has been employed, . . . provided the provisions of this subsection shall not apply if it shall be shown to the satisfaction of the administrator that (a) he is not participating in or financing or directly interested in the labor dispute which caused the unemployment, and (b) he does not belong to a trade, class or organization of workers, members of which, immediately before the commencement of the labor dispute, were employed at the premises at which the labor dispute occurred, . . . and are participating in or financing or directly interested in the dispute; provided any individual whose unemployment is due to a lockout shall not be disqualified, unless the lockout results from demands of the employees as distinguished from an effort on the part of the employer to deprive employees of some advantage they already possess . . . ."

The unemployment commissioners properly concluded that a labor dispute existed from the time of the exchange of the respective proposals concerning changes in the existing contract until the disputed issues were finally settled on November 4, 1948. "The term 'labor dispute' includes 'any controversy concerning terms or conditions of employment, or concerning the

association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment or concerning employment relations, or any controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the proximate relation of employer and employee.' " *Conte* v. *Egan*, 135 Conn. 367, 371. It is undisputed that the employees were members of the union and belonged to the "trade, class or organization of workers, members of which, immediately before the commencement of the labor dispute, were employed at the premises at which the labor dispute occurred, . . . and are participating in or financing or directly interested in the dispute" within the meaning of the statute. § 7508 (3) (b)

The employees are therefore ineligible for benefits unless, as the commissioners concluded, they properly come within the further statutory declaration "provided any individual whose unemployment is due to a lockout shall not be disqualified, unless the lockout results from demands of the employees, as distinguished from an effort on the part of the employer to deprive employees of some advantage they already possess." § 7508 (3) (b).

The question thus presented by this appeal is not, whether another conclusion might have been reached, but whether the commissioners could reasonably conclude that upon the facts found the proviso applied in the employees' case. *Conte* v. *Egan,* supra, 372.

A "lockout" is not defined by statute nor by previous decision in this state but, in general, means "to withhold employment from (a body of employees) as a means of bringing them to accept the employer's terms." Webster's New International Dictionary. The definition found in *Iron Molders' Union* v. *Allis-Chalmers Co.,* 166 Fed. 45, 52, that "A lockout is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms," has received approval in a number of other jurisdictions. *Bankston Creek Collieries, Inc.* v. *Gordon,* 399 Ill. 291, 299; *Bucko* v. *J. F. Quest Foundry Co.,* (Minn.), 38 N. W. 2d 223, 230; *Adkins* v *Indiana Employment Security Division,* 117 Ind. App. 132, 141. *In re North River Logging Co.,* 15 Wash. 2d 204, 208.

The purpose of the Unemployment Compensation Act being remedial in character, it is to be liberally construed as regards beneficiaries. *Waterbury Savings Bank* v. *Danaher,* 128 Conn. 78, 82, 83; *Robert C. Buell & Co.* v. *Danaher,* 127 Conn. 606,

612. Along with its effort to ameliorate the effects of unemploy-
ment the General Assembly has endeavored to safeguard both
employer and employee in the situation created by a labor dis-
pute, while, at the same time, indicating that an employee shall
not be denied relief in the event of a lockout by the employer
brought about, not by demands of the employees, but by "an
effort on the part of the employer to deprive employees of some
advantage they already possess."

The employees' union and the employer were obviously en-
gaged in a contest to better their respective positions in which
the profit motive was the dominating feature. From the stand-
point of strength and resources they were well matched and able
to take care of themselves. In November, 1947, the employer,
in anticipation of the expiration date of the contract, took the
initiative in demanding numerous changes. Had it stopped
there the employer might legitimately claim to have been acting
within the purview of the contract. It went further, however,
and in defiance of its express agreement laid down the edict that
if the parties couldn't agree by the expiration date of the present
contract then the employer would consider it terminated and
that any agreement made thereafter must be effective from its
date. The ineffectiveness of this unilateral attempt to vary the
terms of the contract then controlling the rights of the parties
has already been passed upon by this court, (*Mellitz, J.*). *Inter-
national Brotherhood of Teamsters, Chauffeurs, Warehousemen
& Helpers of America, Local 536* v. *General Ice Cream Corpora-
tion,* Superior Court, Hartford County, No. 82192A. Nothing
need be added here to what has been said there, and the text of
that opinion with its conclusions was before the commissioners
in this case.

The expiration date of the existing contract passed without
agreement being reached, but the employees continued to work
as before while negotiations proceeded. It is significant that the
employer did not, on February 1, issue the notices which came
later, on March 1. Instead it got in readiness to continue opera-
tion by importing prospective replacements for the employees
and familiarizing them with the employees' duties  In spite of
this activity, and although the union, following past custom, had
authorized its executive committee to call a strike at its dis-
cretion, the employees still continued at their work.

On March 1, the employer, having gotten itself in readiness
to continue operations without economic loss, notified its em-
ployees, in effect, that the old contract had ended as of the pre-

ceding January 31, and while the employer expected to continue relations as formerly in some respects, in other respects it would act as it saw fit. The employees were thus given the choice of either continuing to work upon the employer's terms and without the advantages of any contract, or of quitting work entirely. Faced with that ultimatum, the employees quit work the next day, and the employer promptly treated their positions as vacant and sought permanent replacements.

The effect of this strategy was to withhold employment from these employees as effectively as though the employer's premises had been barred and locked to them. To hold otherwise would be to retrogress to the dark ages of labor relations when the price of being allowed to work was to accept the employer's terms. It is not enough to say the jobs were there for the employees when the conditions attached were onerous beyond reason. These employees in practical effect were not, from March 1, offered their former employment if that term is considered to mean, as it should be, employment under their contracts with its incidents of collective bargaining, arbitration rights and other advantages.

The commissioners were warranted upon the facts found in concluding that the employer's conduct amounted to a lockout on March 1, 1948, within the meaning of the statute, and that the lockout did not "result from demands of the employees, as distinguished from an effort on the part of the employer to deprive employees of some advantage they already possess."

Judgment may enter dismissing the appeal.