STELLA CONON ET AL. *v.* ADMINISTRATOR, UNEMPLOYMENT COMPENSATION ACT

MARIE AMARAL ET AL. *v.* ADMINISTRATOR, UNEMPLOYMENT COMPENSATION ACT

BALDWIN, O'SULLIVAN, WYNNE, DALY and ALCORN, Js.

Argued February 3—decided April 5, 1955

*Charles L. Mandelstam,* with whom, on the brief, was *Morris P. Glushien,* of the New York bar, for the appellants (plaintiffs).

*Harry Silverstone,* assistant attorney general, with whom, on the brief, was *John J. Bracken,* attorney general, for the appellee (defendant).

ALCORN, J. These two appeals were presented together because they embrace an identical issue. The plaintiffs are representative of others in similar cases the decision of which turns upon the decisive issue here. The applicable facts are, in most respects, identical, while minor differences make the two cases representative of opposing extremes of the group which they represent. The attacks made on the commissioner's finding have been withdrawn. The issue is whether a payment described as a "vacation check" received by the plaintiffs from an employer-financed fund administered by the plaintiffs' union is a "payment by way of compensation for loss of wages" referable to a specific week for which the plaintiffs were unemployed within the meaning of § 7508 (4)(a) of the General Statutes (as amended, Cum. Sup. 1953, § 2314c).

The commissioner's unchallenged finding is as follows: The plaintiffs are employed in the ladies'

garment industry. This industry is unique in that the demand for workers is subject to violent and unanticipated fluctuation. Changing dress styles make constant production and regular, uniform employment impossible. Production and employment normally experience an annual seasonal decline in late May or early June because of the change-over from summer goods to fall goods. The full production on fall styles generally is reached about the middle of July. Production in the industry is customarily carried on under what is called the jobber-contract system. The jobber selects designs and fabrics, cuts the material and sends it, with the necessary accessories, to the contractor, who then makes up the garment.

The plaintiffs, employed by contractors in Connecticut who were covered by the Unemployment Compensation Act, belong to a union affiliated with and within the jurisdiction of the International Ladies' Garment Workers' Union. The I.L.G.W.U., hereinafter referred to as the union, represents the overwhelming majority of production workers in the ladies' garment industry. Most of its membership is in New York City. The union advertises that one of the advantages of membership is "paid vacations." It owns and operates, on a nonprofit basis, a large hotel and resort for union members and their guests at rates which the workers are able to afford.

The contractors and jobbers are organized, as to each group, in associations of their own. The plaintiffs' employers belong to such a contractors' association. The jobbers for which the plaintiffs' employers work are members of jobbers' associations. The respective associations of contractors and jobbers and the union have made a series of agreements designed to stabilize the very volatile and unusual

ladies' garment industry, to improve and modernize it and to establish conditions tending to secure continuity of employment for workers, fair wages and labor conditions, and methods for the peaceful adjustment of disputes. Because of the unique nature of the business, the agreements establish rules and standards for the relations between contractors and jobbers as well as between them and their union member employees.

Contracts involving the dress industry in greater New York, which includes Connecticut, are negotiated and signed by a joint board comprising representatives of all the greater New York local unions. Another department of the union administers the contracts made with Connecticut contractors and jobbers. The union has had agreements with the respective associations of jobbers and contractors continuously since 1936. The contracts are substantially identical in form. Agreements made with the contractors' associations in 1941 provided: "During the summer, when the vacation season begins, the representatives of the parties hereto shall meet for the purpose of working out regulations concerning the number of weeks as well as the time each worker may take a vacation." Agreements made with the jobbers' associations in 1944 established a fund for reasons stated in the agreements as follows: "In line with recent trends in which members of many industries have, through collective labor agreements, contributed toward a Fund for the payment of vacation and health benefits to workers, there is established by the parties hereto, a Health Fund for all members of the Union who are covered by this collective agreement to provide them with health benefits and contributions toward vacation benefits." The fund is now known as the health and

welfare fund. Agreements in 1944 extended the 1941 agreements to January 31, 1947. In agreements made in 1947, the clause quoted from the 1941 agreements was omitted and the following was substituted: "Vacations shall be granted to workers in accordance with the rules and regulations promulgated by the Joint Board for the Health and Welfare Fund." This is the provision now in effect.

The health and welfare fund is an irrevocable trust fund. It is administered under rules and regulations established solely in the discretion of the joint board. The agreements provide that it is to be administered for the sole purpose of providing members in "all crafts covered by the collective agreement with health benefits and contributions toward vacation benefits in conformity with the Rules and Regulations of said 'Fund.'" The corpus of the health and welfare fund is made up entirely of contributions made by the jobbers, the contractors and another employer group, known as the manufacturers, which is not involved in the present controversy. The contributions are fixed under the agreements at a certain percentage of the wages paid by the jobber or contractor to his employees. From 1944 to 1950, inclusive, the figure was 3.5 per cent; since January 1, 1951, it has been 4 per cent. The agreements between the union and the jobbers created the fund. The agreements between the union and the contractors provided for the employees' vacations. The jobbers make the payments to the fund. The payments are based upon the determined percentage of the amounts paid their own employees and the amounts paid the employees of their contractors. If, however, a contractor does work for a jobber who is not covered by the agreements with the union, the contractor pays his contribution directly to the

fund. The contributions thus made are agreed not to be wages and are not subject to the withholding tax. The contractors who employed the plaintiffs paid the agreed 4 per cent contribution to the fund.

The union's joint board, the jobber and a committee of employees of the contractors working for the jobber agree on the piecework rate to be paid each contractor's employees. In like manner, the amount to be paid the contractor by the jobber is fixed; it consists of the employees' piecework rates plus a sum for overhead and a reasonable profit. That sum is fixed by agreement between the jobbers' association and the contractors' association. In addition to paying the contractor, the jobber transmits, for the contractor, the latter's unemployment taxes to the state of Connecticut and the federal government and his share of the old age insurance contributions to the federal government with respect to the wages paid by him to his employees.

The contractor prepares a Connecticut unemployment compensation tax return at the end of each calendar quarter showing the total wages paid by him and the tax due. He determines what proportion of the total tax is based on wages paid his non-production union employees and what proportion is based on wages paid his production union employees, the latter figure being that which is to be paid by his jobbers, and notifies them of the amount due. Both the jobber and the contractor then transmit to a union official known as the impartial chairman the respective amounts due, and he in turn transmits them to the state along with the returns on which they are based. Remittance of the unemployment tax due the federal government is made in the same way. With respect to the old age insurance contributions to the federal government, the contractor

withholds the employees' portion of the tax and transmits it to the impartial chairman, and the jobber transmits the employer's share of the tax to the impartial chairman. He then sends both remittances with the supporting returns to the federal authorities. The impartial chairman is an office created by the agreements and financed jointly by the union and the manufacturer groups. His function is to arbitrate disputes between the parties and to transmit the unemployment taxes and old age insurance contributions, as already described.

On or about February 25, 1952, the appropriate union agencies adopted a schedule of, and determined the basis of eligibility for, vacation benefits payable in 1952 to workers in the various crafts employed in shops which contributed to the health and welfare fund. The schedule of benefits is determined after the amount available is found by deducting from the total of contributions and earnings on investments the amounts necessary for reserves, administration expenses and disbursements for health and other welfare benefits. For a union member to be eligible for vacation benefits in 1952, his union dues had to be fully paid and he had to have worked for a union employer, but not necessarily the same employer, for any twenty-six weeks of the year beginning July 1, 1951. The plaintiffs met these qualifications. The determination was made during March and April, 1952. In 1951, 53.10 per cent of the fund available to employees such as the plaintiffs was disbursed for vacation benefits, while 38.06 per cent was allocated to health and other welfare benefits, 4.83 per cent for administration expenses, and 4.01 per cent for reserves. The individual payments from the fund are fixed according to the craft with which the employee is

identified and approximate the employee's weekly pay. The amount to which each of the named plaintiffs was entitled was $45. The plaintiff Conon obtained her check from her local union office about June 16, 1952. The plaintiff Amaral obtained her check at her place of employment on June 24, 1952. Both checks were issued by an agency of the union on a bank account designated as a vacation fund. The checks were issued to eligible employees whether or not they actually took a vacation. The payment covered one week. No specific vacation period had been designated by the union under the agreements.

Most Connecticut dress shops close for at least one week in the summer, usually the week in which July 4 falls. The shop where the plaintiff Conon was employed was closed between the week ending June 6 and the week ending July 5, 1952, owing to lack of work. In accordance with the practice of many years, the shop where the plaintiff Amaral was employed closed for the week ending July 5, 1952, in order to give its employees a vacation. Both of the named plaintiffs applied for unemployment compensation for the respective periods during which they were out of work. The plaintiff Conon did not elect to designate any specific week of her period of unemployment as a paid vacation week. The compensation rate for each plaintiff was $24 per week. The administrator denied the plaintiff Conon compensation for one week of the period between the week ending June 6 and the week ending July 5, 1952, but allowed her compensation for the remainder of the period. He denied compensation to the plaintiff Amaral for the single week ending July 5, 1952. On appeal, the commissioner sustained the administrator's decision in each case. In the Superior Court, in turn, the appeals were

dismissed and the decisions of the commissioner were affirmed.

The applicable statute, so far as material, provided: "An individual shall be ineligible for benefits . . . (4) during any week with respect to which the individual has received or is about to receive remuneration in the form of (a) . . . any payment by way of compensation for loss of wages." General Statutes, § 7508 (4)(a) (as amended, Cum. Sup. 1953, § 2314c). The substance of the commissioner's decision as affirmed in the Superior Court is that a payment made from the fund under the circumstances recited is a payment by way of compensation for loss of wages.

This court has already determined that payments provided for in a contract between an employer and a union representing his employees and intended to be compensation for vacation periods are payments "by way of compensation for loss of wages." *Kelly* v. *Administrator,* 136 Conn. 482, 487, 72 A.2d 54. We said: "It is the plain intendment of [the] statute that, when there is an agreement in the contract of employment for a vacation and compensation is provided in an amount substantially equivalent to the pay an employee would have received for services rendered if he had actually worked, he is not eligible for unemployment benefits during the period of his vacation." Ibid. We have also said that it is the "intent of the statute to limit the disqualification to those situations in which the payment of compensation for loss of wages is made or provided by the employer in whose employ the unemployed person has earned his right to unemployment benefits." *Kneeland* v. *Administrator,* 138 Conn. 630, 635, 88 A.2d 376. The application of these principles to the facts before us involves the interpretation of the

intent expressed in the contracts read in the light of the statute. *Kelly* v. *Administrator, supra,* 486. The question is one of law. *Brannigan* v. *Administrator,* 139 Conn. 572, 577, 95 A.2d 798. It is not materially significant that a series of contracts rather than a single contract is involved.

The apparent intent was to provide a means for insuring a vacation week with pay to employee members of the union out of funds provided by their employers. The complicated and unusual methods of operation in the industry are naturally productive of the multiplicity of contracts. The end result was a unified plan. The contract with the immediate employer specified that "vacations shall be granted to workers." The fund from which the payment was made was provided by the employer. While he did not pay a specific amount to or for any designated employee it is to be noted that the percentage payment called for by his contract was in an amount sufficient to provide a week's vacation payment at a rate approximating the weekly wage for any given employee's craft. In spite of the complicated relationships involved, the contracts were skilfully designed to afford compensation for vacation periods.

Upon the application of the principles already established, the payments fall within the class of "payments by way of compensation for loss of wages" within the meaning of the statute. The fact that the actual payment was entrusted to the agency of the union is not significant. In the first place, the union did not, under the terms of the agreements, have an uncontrolled discretion. The fund is established "for the payment of vacation and health benefits to workers," and it is "for all members of the Union who are covered by this collective agreement to provide them with health benefits and contributions

toward vacation benefits." In the second place, the benefits in the cases here presented were actually paid. "It is not a question of how the payments are made but why they are made." *Brannigan* v. *Administrator,* supra, 575.

The remaining question for consideration is the propriety of the commissioner's application of the vacation pay to the period of unemployment here in issue. In the determination of this question, the significant inquiry is whether the vacation payments which these employees actually received were related to an ascertainable week during which they lost wages. General Statutes, § 7508 (4)(a) (as amended, Cum. Sup. 1953, § 2314c), makes an individual ineligible for unemployment benefits during any week with respect to which he has received any payment by way of compensation for loss of wages. The facts in the present cases are basically not unlike those in *Kelly* v. *Administrator,* 136 Conn. 482, 72 A.2d 54. In that case it was agreed between the employer and the employees' union that a vacation should be given the employees and that the employer could designate the week which included July 4 as a vacation week; if it did not do so, the vacation period was to be determined by arrangement between the employer and each employee. The employer did designate a vacation period which included July 4 and on June 21 paid the employees the agreed amount of vacation pay. We held that the payment was a payment by way of compensation for loss of wages for the period designated and that consequently the employees were ineligible for unemployment compensation benefits.

In the present cases, the contracts required the employers to give vacations to their employees. While earlier agreements had provided that the em-

ployer and the union would meet during the summer, when the vacation season begins, to work out regulations concerning the number of weeks each worker might take as a vacation as well as the time, the agreement under consideration left the designation of the time to the discretion of the union. The slack time in the industry is from late May until mid-July. Most of the shops close for at least one full week in summer. This is usually the week which includes July 4. The union determined which employees were eligible for vacation benefits in the year 1952 during March and April of that year. The plaintiffs were among the ones found eligible. The amount of the benefit was also determined, and it exceeded the unemployment rate and approximated the plaintiffs' weekly wages. The payment covered one week. It was made to the plaintiff Conon on June 16 and to the plaintiff Amaral on June 24. The shop where the plaintiff Conon was employed had closed during the week ending June 6 and did not reopen until after the week ending July 5. The shop where the plaintiff Amaral was employed closed for a specific vacation week, which included July 5, designated by the employer. Both shops were thus closed during the vacation week traditional in the industry and within the contemplation of the parties to the contracts.

The basic circumstances underlying the contracts between the parties made it unnecessary for the union to specify more than the length of the vacation period and the rate of pay for the employees. In the absence of some other designation, the range of time within which the vacation was to be taken was clearly fixed by the established custom in the industry. It would be entirely unreasonable on the facts before us to say that the union contemplated that vacations would be taken other than during the

slack period between the end of May and mid-July. What it did in reality was to provide, within that range, for a one-week paid vacation period, fix the amounts to be paid from funds supplied by the employer, and specify the persons who were to receive them. In the Amaral case the employer, in addition, selected a specific vacation week within that period. In the Conon case there was no such designation. The plaintiff Conon's period of idleness was, however, within the limits of the contemplated vacation season. The fact that neither she nor her employer saw fit to describe one of those weeks as a vacation week does not alter the fact that she did receive payment of compensation for one such week in lieu of wages. It is the fact rather than the nomenclature which is controlling. The statute says that such a payment for "any week" disqualifies the individual. If the union had specifically stated by rule or regulation under the contract that the employee was to receive vacation pay in a designated amount for any week during the period between the end of May and mid-July, it could not reasonably be argued that a payment made accordingly did not disqualify under the statute. Yet that is exactly what was done in substance here. The commissioner was correct in applying the vacation pay in the Amaral case to the single week there involved and in applying it to one week of the unemployment in the Conon case.

There is no error.

In this opinion BALDWIN, WYNNE and DALY, Js., concurred.

O'SULLIVAN, J. (dissenting). I take the rule of law to be that unemployment compensation legislation, being, as it is, an attack upon a recognized social and economic evil, is entitled to a liberality of con-

struction. *Derench* v. *Administrator,* 141 Conn. 321, 324, 106 A.2d 150; *Kelly* v. *Administrator,* 136 Conn. 482, 487, 72 A.2d 54; *Harris* v. *Egan,* 135 Conn. 102, 105, 60 A.2d 922; *Reger* v. *Administrator,* 132 Conn. 647, 650, 46 A.2d 844; *Waterbury Savings Bank* v. *Danaher,* 128 Conn. 78, 82, 20 A.2d 455. In applying that rule, it is just as necessary to construe in a strict manner the statutory provisions disqualifying employees as it is to construe liberally the provisions qualifying them for benefits.

The provision upon which the defendant relied recites that "[a]n individual shall be ineligible for benefits . . . during any week with respect to which the individual has received or is about to receive remuneration in the form of . . . any payment by way of compensation for loss of wages." General Statutes § 7508 (4) (a) (as amended, Cum. Sup. 1953, § 2314c). A proper construction of this provision is that the remuneration has to be allocated to a specific week if it is to disqualify.

The defendant concedes, as, indeed, frankness demands, that "the contract does not expressly allocate the vacation benefit to any specific week [and it] is also a fact that the parties at the time of its payment did not allocate it to any specific week." It necessarily follows that, in the absence of such an allocation, there was no cause to disqualify the plaintiffs.