105 So.2d 721

**D. L. SPEAGLE et al.**

**v.**

**UNITED STATES STEEL CORPORATION**
**and Department of Industrial**
**Relations.**

**6 Div. 569.**

Court of Appeals of Alabama.

June 17, 1958.

Rehearing Denied Aug. 19, 1958.

Cooper, Mitch & Black, Birmingham, for appellants.

Burr, McKamy, Moore & Thomas, Birmingham, for appellees.

CATES, Judge.

This is a consolidated appeal by four employees of the Tennessee Coal and Iron Division of the United States Steel Corporation who were denied unemployment compensation by the Jefferson Circuit Court.

Their unemployment occurred during the summer of 1955. The conductors working in the corporation's Rail Transportation Department were on strike from July 29 to August 11.

These cases were companion to the employer's appeals in United States Steel Corp. v. Grimes, 104 So.2d 329; [1] United States Steel Corp. v. Garris, 104 So.2d 327; [2] United States Steel Corp. v. Baxley, — So.2d —; United States Steel Corp. v. Patterson, 104 So.2d 330; [3] United States Steel Corp. v. Walton, 104 So.2d 331; [4] United States Steel Corp. v. Glasgow, — So.2d —; United States Steel Corp. v. Curry, — So.2d —; United States Steel Corp. v. Case, 104 So.2d 332; [5] United States Steel Corp. v. Goodwin, 104 So.2d 333,[6] and United States Steel Corp. v. Lewis, 104 So.2d 335 [7] (which arose out of the 1955 conductors' and the 1956 locomotive engineers' strikes and were all decided March 25, 1958, along with U. S. Steel Corp. v. Wood, — So.2d — —a 1954 strike case), today we are also deciding em-

1. Ante, p. 431.
2. Ante, p. 428.
3. Ante, p. 430.
4. Ante, p. 430.

5. Ante, p. 431.
6. Ante, p. 432.
7. Ante, p. 432.

ployee appeals in Phelps v. United States Steel Corp., 105 So.2d 714,[8] and Widmar v. United States Steel Corp., 105 So.2d 716.[9] Reference should be made from opinion to opinion.

Under Code 1940, T. 13, § 88, we certified questions to and received answers from the Supreme Court as follows:

Inquiry No. 1. Under Code 1940, T. 26, § 214, subd. A, as amended, does an employee of an employer against whom there is pending a labor dispute (involving other employees) in active progress at the establishment of his employment become disqualified if he refuses to cross a peaceful picket line in order to report to work?

### Response

"We think that a voluntary refusal by an employee to cross a peaceful picket line set up in a labor dispute by some union, of which claimant is not a member, to work on a job still open to him by his employer, disqualifies an employee, while so doing, for unemployment benefits under section 214–A, Title 26, pocket part, Code."

Inquiry No. 2. If the answer to the first question is in the affirmative, would there be a different answer if the place of work at which the picket line stands was not in the same "establishment" as that in which the dispute existed?

### Response

"We think inquiry No. 2 is governed by the same principles stated above; and, therefore, the answer to inquiry No. 2 is *No*."

Inquiry No. 3. Is the refusal to cross a picket line by a nonstriking employee who does so because of his adherence to a tenet of his trade unionism a ground for disqualification under § 214, subd. A, as amended, supra?

### Response

"Assuming that his refusal to cross the picket line is solely because of his adherence to a tenet of his trade unionism, we answer *Yes*."

Inquiry No. 4. Is an employee's statement of his apprehending violence to his person, if he were to cross a picket line, legal evidence; and, if so, is such apprehension (without further evidence of anticipated violence) which leads to his refusal to cross a picket line (thrown up by a union to which he does not belong) before his working establishment sufficient and good ground to remove the disqualifying effect of said § 214, subd. A, as amended, supra?

### Response

"In answer to this question it is our opinion that an employee's statement of his apprehension of violence to his person if he were to cross a picket line would not be legal evidence. Mc-Guff v. State, 248 Ala. 259, 27 So.2d 241."

The response of the Supreme Court was preceded by the following:

"* * * Attention is directed to the absence from section 214, subd. A, supra, of any reference to the act of crossing a picket line during a labor dispute.

"It is observed that to disqualify an employee for receiving unemployment benefits on account of a strike, his unemployment must be '*directly due*' to a labor dispute still in active progress in the establishment in which he is or was last employed.—Section 214, subd. A, Title 26, pocket part, Code. Emphasis is placed upon the words '*directly due*'. This is referred to and applied in Department of Industrial Relations v. Drummond, 30 Ala.App. 78, 1 So.2d 395, 397, certiorari denied, 241 Ala. 142, 1 So.2d 402, as follows:

8. Ante, p. 541.

9. Ante, p. 547.

" 'It thus appears that, because of the apprehension of the employer company that to allow some employees to work when others (the C. I. O. affiliates) were on strike would result in violence, the appellee was locked out of work by the published notices and close down of the Wylam Mine. This, therefore, was the *direct* cause of appellee's unemployment and not the "labor dispute" in which the C. I. O. affiliates were involved.'

" '* * * the Legislature never intended that one, who has purchased his protection against involuntary unemployment, should be denied those benefits because of a "labor dispute" in which he was in no way involved and the causes of which unemployment he, his agents or organization were powerless to avert.'

"The Court of Appeals held in the Drummond case, supra, that section 214, subd. A, supra, does not serve to disqualify employees for unemployment benefits when their unemployment results from a shut down of the operations in which such employee has been engaged, and when the shut down of those operations is the result of an apprehension by the *employer* that there would be violence if there was an attempt to operate during the labor dispute and strike in which the complaining employees did not participate.

"The same theory was recognized in Usher v. Department of Industrial Relations, 261 Ala. 509, 75 So.2d 165. See, also, T. R. Miller Mill Co. v. Johns, 261 Ala. 615, 75 So.2d 675, 680.

"Attention is called to the following statement in the Johns case, supra: 'It thus appears that it (section 214, subd. A) contains all the disabilities (disqualifications?) that the legislature intended to impose because of a labor dispute'. Attention is also directed to a feature of the quotation from the Drummond case, supra, which declares in substance that an employee has purchased the right to unemployment benefits not to be denied him on account of a labor dispute 'in which he was in no way involved and the causes of which unemployment he, his agents or organization were powerless to avert.'

"The Drummond, Usher and Johns cases, supra, are clear and distinct to the effect that subsection A of section 214 does not disqualify an employee for such benefits by reason of a labor dispute unless he is directly involved in the dispute. Such employment would not be directly due to a labor dispute if his employer closed the shop, in which he was engaged, on account of his fear that violence would result, even though such closing was directly due to the peaceful picketing which in turn was directly due to a labor dispute in which the claimant was not involved.

"There are many cases which hold that the refusal to cross a picket line to go to work does disqualify an employee for benefits, when such refusal does not result from a well-founded apprehension of personal violence to do so, and *his job continues to be open to him*, because such is a 'participation' in a labor dispute which under the statute disqualifies one for so doing. Baldassaris v. Egan, 135 Conn. 695, 68 A.2d 120; American Brake Shoe Co. v. Annunzio, 405 Ill. 44, 90 N.E.2d 83; Aitken v. Board of Review, 136 N.J.L. 372, 56 A. 2d 587. See, also, 28 A.L.R.2d 333."

Within this framework we shall discuss the evidence pertaining to each appellant seriatim.

### I. Speagle

Speagle worked at the "Tin Mill." He reported for work at 7:00 A. M., July 30, 1955. He contends that a crane operator was needed in and about the work of the mill at which he worked. Parts of his testimony run:

"  *   *   *   there was a little discussion that went on and then Mr. English come out, he is superintendent of our department, and in the meantime they asked us how come we were not rolling and the best I remember I think the colored man Arthur made the statement, 'We don't have no coil.' At the time we didn't have a coil back there to come into the mill and always on the first coil I cut the tail end off to see what kind of marks are on it and then I had just finished that and I walked back and got in the discussion and we were standing waiting to get a coil where we could start rolling and something—I forgot how it was—but something was said about the conductors on strike and pickets at the gate. Then Mr. English asked us were we going to roll and I don't remember what the answers were, what the rollers told him but I asked him what was the trouble and he said he didn't know. He went back to the office and I walked back in the office and I thought I would call down to the local union and I asked permission to use the phone in Mr. English's office and he said, 'I would like to know the details myself' and I called down and a woman answered the phone and she told me the conductors were on strike about their contract. Then I come back and told them what it was and that is the way it was.

"Q. Is that how you found out there was a conductors' strike? A. Yes, sir.

"Q. When you told Mr. English or the other foreman that you were needing a coil, did anyone point out that— the coil had to be moved by crane? A. We all took that for granted.

"Q. Did he ever assign anybody to the crane to move the coils? A. To my knowing he didn't.

"Q. Did you fellows just walk off or did you take any steps to close down the line? A. Mr. English said, 'Make up your mind what you want to do, roll or go home' and I didn't say nothing. I didn't have a coil on the ramp and didn't nobody else and he said, 'Just as well send you on home' and it is always our duty to get on the screws and take care of the mill in case when it does start up it will be available.

"Q. Did you do that on this occasion? A. Yes, sir.

*   *   *   *   *   *

"When Mr. English told you to make up your mind whether you were going to roll or work or not work—he asked you that? A. Yes, sir.

"Q. You didn't wait to see if it were possible for management to get other coils there, did you? Didn't you almost immediately go out? A. I was one of the last ones to leave the mill.

"Q. When did the other employees of your crew leave the mill? A. I couldn't say when they clocked out. The crowd commenced to disperse.

"Q. Were you willing or not willing to do production work when you found out the pickets were there? A. I was willing to work.

"Q. You were? A. Yes, I come out with the intention to work.

"Q. You did? When you came out there were no pickets there, isn't that right? A. I come in—I always come in early and when I come in there wasn't any there because our clothes get pretty greasy and I had a change of clothes and I had to get my taps and stuff out of my other clothes and I come in early and we don't come in by the main gate and we come in from the Dolomite district and I didn't see no pickets when I come in.

"Q. When does your regular turn begin? When do you start work? A. Seven o'clock.

"Q. About when did you check out? A. About I would say 7:30. It was

about 8 o'clock when I went out of the mill.

"Q. You clocked out a half hour after you came to work? A. Yes, sir."

Set over against this contention, the employer adduced testimony to the effect that the Tin Mill had inventory of unfinished work in process which would have allowed it to continue operation for approximately twelve days after the strike began. Speagle's shift foreman testified that the mill ("the Tandem Mill") could have been operated had not the crew with which Speagle worked clocked out on learning that the conductors had thrown up a picket line. As to being held up for lack of crane operators, he testified:

"Q. If you had had crews available to continue the Tandem Mill operations at 7:30 on Saturday, could you have arranged for the necessary crane operators and other personnel to continue the production? A. Yes, I had other crane operators that had operated before available."

While this foreman admitted on cross-examination that the crane operation (of moving coils of tin strip about) might have been somewhat awkward, we consider there was substantial evidence from which the trial judge could have found Speagle did not work that day (August 30, 1955) because of the presence of pickets.

In pronouncing his decision, the trial judge said:

"There are two others, one is Mr. Speigel (sic) in the Tin Mill. As to his testimony and the testimony with reference to him, I don't think there is a great deal of dispute about what actually happened. There may be some dispute about the ability to operate the Mill, and so forth, and he did report to work and worked there a fairly short time, and then he left, apparently after he heard that the Brotherhood, or whatever the other Union was at the

time, was on strike in 1955, and he left the Tin Mill and didn't return. I would have to say he thereby became disqualified. I think under the evidence they were able to operate and as I recall, they did operate for some time after he left. I may be wrong about that, I don't recall, but at any rate, he did just apparently leave the job after he heard that there were pickets by the Rail Transportation Union which was striking. I would have to say under the evidence there and under the applicable rule, Mr. Speigel (sic) would be disqualified."

■ There was no testimony as to whether or not Speagle reported for work again during the strike. In view of the statements of counsel in the trial below, the initial cause of Speagle's unemployment is taken by both sides as determinative. The presumption of the continuance of his unemployment status until the end of the strike would seem to be a logical inference here, South Highlands Infirmary v. Imperial Laundry Co., 25 Ala.App. 461, 149 So. 106, State v. Retail Credit Co., 25 Ala. App. 568, 151 So. 474; 31 C.J.S. Evidence § 124 b(2).

■ We cannot say the preponderance of the evidence is against the judgment below as to Speagle.

## II. Chaney

The trial judge announced his decision at the conclusion of the evidence, saying with respect to this (and the other claims of instant concern):

"Eleanor B. Armstrong and Wallace B. McCullough at the Wire Works Office, and Eugene L. Chaney, now, those three the Board held they were disqualified. I am going to make the same decision and I will say for the record, and, of course, the matter is going to the Supreme Court, there is some evidence there certainly as to Mrs. Arm-

strong that she was told at the picket line something about her name not being on the list, or something to that effect, and she turned around and went back. There was something similar as to Mr. McCullough. The picket said something to him about going home, told him to go home, then Chaney he had a similar experience. It is not clear as to Mr. Chaney as to whether a picket told him that he couldn't pass on or not, but there was some discussion there near the picket line and Mr. Chaney testified that he was told that they were not letting employees through that line at the mill and he went home.

"Now, the evidence about Mr. Chaney is by other people on that date many employees did go through there and did work on that same day, and I don't see how, under the evidence, I could say under the rule, as I understand it to be, I don't think I could say that there was any evidence on the part of Mr. Chaney I don't think I could say that under the rule.

"As to the other two, Mrs. Armstrong and Mr. McCullough, their cases may be somewhat stronger than Chaney's case, but the rule, as I understand it, and I have studied all of these cases that have been cited to me, I think the rule undoubtedly is if there is violence, or if there is a reasonable apprehension of violence at the picket line, then an employee certainly is not required to put himself in jeopardy and attempt to go across.

"However, I would say under the authorities that the evidence here is not sufficient to show that certainly there was no violence there, I don't believe under the evidence there is sufficient evidence to show there was a reasonable apprehension of violence. As I say, I am not passing on whether a person ought to cross over a picket line or not. That is not involved here. * * *"

Mr. Chaney worked at the Sheet Mill as a shipper. He came out to the plant gate on Monday, August 1. He saw a gang of people there—75 or 100. He testified (in part):

"Q. There was a large crowd there? A. Yes, sir.

"Q. Were you told not to go in? A. Yes, sir.

"Q. Was it your judgment at that time that in order to get in—I mean that you could get in without being involved in any argument or difficulty or fracas of some kind with the crowd of people there?

\* \* \* \* \* \*

"A. After they said there was nobody going in I wouldn't have wanted to try it. I ain't nobody to get a knot on my head or anything.

\* \* \* \* \* \*

"Q. Would you cross a peaceful picket line maintained by the United Steelworkers? A. Yes, sir, if there was no danger in getting hurt afterwards, but as you know we have always heard there is such a thing as afterwards getting your family hurt or your house blown up or something like that and I don't go for that.

"Q. Did you see any violence there at the time? A. No, not when I was there.

"Q. Most of the 75 or 100 people you saw there were fellow workers at the Sheet Mill? A. I couldn't say that. There was a few I did know but there was a lot I didn't know. I don't know that I have seen them before."

■ There was testimony that there was work waiting for him had he come into the plant. In the light of the first response of the Supreme Court, supra, we cannot hold the trial judge's conclusion was erroneous.

### III. Elinor B. Armstrong

■ Mrs. Armstrong was paid, at her election, a week's pay which counted

against her vacation time. Her last day of work was Tuesday, August 2, 1955. The strike ended Friday, August 12, 1955. Inasmuch as the statute required a one week's waiting period before compensability (§ 213, subd. D, as amended), and Mrs. Armstrong received a week's pay for part of this time, she had no compensable wage loss, Wellman v. Riley, 95 N.H. 507, 67 A. 2d 428. Thus, in Golubski v. Unemployment Compensation Board of Review, 171 Pa.Super. 634, 91 A.2d 315, 317, 30 A.L.R. 2d 362, the court stated:

> "As to the claimants in group (b) who had received 'vacation pay' for one week, none of them is entitled to unemployment compensation on this record. The week for which they were not paid constituted only the waiting period required by the Act, so that they were only unemployed for one week, having been compensated for the first week."

See also annotation in 30 A.L.R.2d 366; Battaglia v. Board of Review, 14 N.J.Super. 24, 81 A.2d 186; Grobe v. Board of Review, 409 Ill. 576, 101 N.E.2d 95; Allen v. Maryland Employment Security Board, 206 Md. 316, 111 A.2d 645; Shand v. California Employment Stabilization Comm., 124 Cal.App.2d 54, 268 P.2d 193; Conon v. Administrator, Unemployment Compensation Act, 142 Conn. 236, 113 A.2d 354; Kalen v. Director of Division of Employment Security, 334 Mass. 503, 136 N.E.2d 257; Adams v. Review Board of Indiana Employment Security Division, Ind., 143 N.E. 2d 564.

### IV. McCuller

 Mr. McCuller worked in the accounting department at the Fairfield Sheet Mill. When he tried to go to work August 3, 1955, the pickets outside the gate told him to go home. He obeyed—"I am never going to buck three men at the same time."

The trial judge considered that McCuller had the burden to show a reasonable apprehension. We cannot disagree with this view since the claimant had work available awaiting him at his place of work if he had gone past the pickets.

### V. Conclusion

Upon consideration of the foregoing authorities, we conclude the judgment below, which denied statutory benefits as to all four of these appellant-claimants, is due to be

Affirmed.