165 So.2d 716

**EVERGREEN TEXTILES, INC.**

**v.**

**STATE DEPARTMENT OF INDUSTRIAL RELATIONS, et al.**

**4 Div. 477.**

Court of Appeals of Alabama.

Jan. 14, 1964.

Rehearing Granted Feb. 25, 1964.

Further Rehearing Denied May 12, 1964.

W. H. Albritton, Albrittons & Rankin, Andalusia, for appellant.

J. Fletcher Jones, Andalusia, for appellee Wells.

PER. CURIAM.

I.

The facts in addition to those given in the opinion of JOHNSON, J., can be amplified from the appellant's application for rehearing:

"We respectfully request the Court to clarify one portion of the Statement of Fact in its Opinion, as follows:

"(a) On page 3 of the Opinion, last paragraph [¶ 8 of dissenting opinion, infra], the Court states the occasion involving the machine repair and the action of Mr. White, the Plant Manager concerning same. The Opinion recites that—

"'Mr. White entered the rest room and "got all over" him but said nothing to the other two mechanics and left them in the rest room smoking.'

"The inference seems to be that Mr. White was reprimanding him about being in the rest room, but said nothing to the other two mechanics and left them in the rest room smoking. This was not the case, under the undisputed testimony. As to this, Appellee testified:

"'Well, Mr. White came in about the time I was preparing to leave and he started getting all over me *about having another machine out there that was broke down and he wanted me on it.*' (Tr. 15, 16)

"Also, the Opinion of the Court recites that—

"'Wells further stated that on his way to pick up his tool to fix *another* machine, some operator stopped him at her machine for not more than one-half a minute to ask him a question, possibly about her machine, and Mr. White *came up* "ready to chew again".'

"As a matter of fact, the incident did not concern *'another'* machine, but the same machine which Mr. White had directed him to fix; and, Mr. White did

not 'come up' ready to chew again, rather he was waiting *at the same machine which he had directed Wells to fix*. As to this, Appellee testified:

" 'Well, Mr. White came in about the time I was preparing to leave and he started getting all over me about having *another* machine out there what was broke down and he wanted me on it. * * * So I told him I would get on the machine, but in my mind I was wondering why that one of the other mechanics that had a lot more experience than I did—I had about two years experience and each one of them had about fifteen or twenty, but they were left smoking in the rest room and nothing said to them. Well, I go back up to the other end of the building to get my tools and started back. Some operator on the way—I remember and I could tell her name if I have to—stopped by. She stopped me for some reason, maybe to ask me a question about her machine, I don't remember what, but I stopped, I'd say, for about half a minute, not more than that, I don't think. *I continued on to the machine and when I got back Mr. White was at the machine and ready to chew again.*'

"Furthermore, we respectfully submit that in order to put the case in a proper context, the following additional Statements of Fact should be added to the Opinion, based on the undisputed testimony of Appellee, viz.:

"(a) 'I think I first became employed by Alabama Textile Products Corporation here in Andalusia in August of 1952. I worked with Alatex until 1957 * * * The day that Alatex turned out for vacation in the summer of 1957, on that day I got a notice from Chemstrand to come and go to work the following Monday. * * * I went to work at Chemstrand on that day and didn't come back to Alatex to be reinstated, not right away. I worked at Chemstrand about three or four

months, until about September, 1957. I came back to work for Alatex in the Alatex plant and they took me back. Then in July, 1959 I was employed by Evergreen Textiles over at Evergreen, Alabama—I was transferred. I don't remember how long I worked for Evergreen Textiles then, but it was some few months. Then I took a job with another Company. I quit my job voluntarily. I took a job with Liberty National Insurance Company. I worked about four or five weeks for Liberty National. That was about December 7, 1959. Then I came back to the Evergreen Plant. I saw Mr. White. I asked him for my job back. He took me back. The last few months that both Mr. White and I were at Alatex in Andalusia I worked under Mr. White.' (See pages 9 and 10 of Appellant's Brief)

"(b) The fact that Mr. Wells, two weeks before the date he quit his job had turned in a notice of voluntary leaving, which he revoked, is also a matter of importance. As to this Appellee testified:

" 'About a week or two, I don't remember exactly how many days, I had turned in a notice, a verbal notice, to leave. But during the time and before the deadline of the termination I decided to stay on. I think it was a one weeks notice, I can't be sure. I gave this notice to Mr. Russ White. I can't remember the exact words I used in giving the notice, but it was something to the effect that it had come to the point that we couldn't get along. It was just too hard to stay. And that it looked like I was going to have to leave. So, he accepted my weeks notice, or two weeks. * * *' (See pages 3 and 4 of Appellant's Brief.)

"(c) It is also an important part of the general background of the facts in this case that Appellee, Wells, had several times requested transfer from Evergreen back to Alatex at Anda-

lusia and that his home was nearer Andalusia than it was to Evergreen; also, his wife worked at Alatex in Andalusia.

"(d) The time Appellee Wells told the Plant Manager, White, that he wasn't going to wait until 4:00 o'clock, but was going to see Mr. Taylor then is of substantial importance as a part of the background.

" 'That was in the middle of the work day, about 11:30 in the morning. My working hours in Evergreen Textiles were from 7:00 in the morning until 12:00 noon, and 1:00 in the afternoon until 4:00 in the afternoon.' "

## II.

■ Burden, under Code 1940, T. 26, § 214 subd. B, is on claimant to show good cause connected with his work for leaving it.

In Speagle v. United States Steel Corp., 39 Ala.App. 559, 105 So.2d 721, we asked:

"Inquiry No. 4. Is an employee's statement of his apprehending violence to his person, if he were to cross a picket line, legal evidence; and, if so, is such apprehension (without further evidence of anticipated violence) which leads to his refusal to cross a picket line (thrown up by a union to which he does not belong) before his working establishment sufficient and good ground to remove the disqualifying effect of said § 214, subd. A, as amended, supra?"

To which the Supreme Court responded:

" 'In answer to this question it is our opinion that an employee's statement of his apprehension of violence to his person if he were to cross a picket line would not be legal evidence. McGuff v. State, 248 Ala. 259, 27 So.2d 241.' "

In reversing this court, the Supreme Court, per Simpson, J., said (Avondale

Mills v. Burnett, 268 Ala. 82, 106 So.2d 885):

"We find a good definition of 'good cause' within the meaning of the Code section, supra, in Department of Indus. Rel. v. Mann, 35 Ala.App. 505, 50 So. 2d 780, 783, where it is stated: 'We must therefore conclude that the legislature meant a reasonable cause, one that is material and substantial as applied to a particular set of facts'.

"We think the two cases of Henderson v. Department of Indus. Rel., 252 Ala. 239, 40 So.2d 629, and Department of Indus. Rel. v. Wall, 34 Ala.App. 530, 41 So.2d 611 are conclusive to the result that the claimant failed to discharge the burden of proof. Where an employee leaves his work of his own volition, he has the burden of proving facts to avoid the requirement of the statutory provision, supra. In the case at bar, therefore, the burden of proof was upon claimant, Burnett, to show that he left the employment of Avondale Mills for good cause connected with the work. In our opinion, the claimant failed to meet this burden."

And, in formulating another reversal, Goodwyn, J., in Andala Co. v. Ganus, 269 Ala. 571, 115 So.2d 123, said:

"The pertinent consideration is whether or not claimant acted reasonably in quitting her job. In other words, a test of good cause is whether it is reasonable when measured by what the average or normal worker would have done under similar circumstances. Can it be said that claimant, under the facts as stated in the opinion, acted reasonably, that is, as an average or normal worker? * * *"

What were the specific items of cause which claimant advances?

■ 1) There is some evidence of his wife's being transferred back to Andalusia. In spite of all that Brown, J., said in dissent in Ex parte Alabama

Textile Products, 242 Ala. 609, 7 So.2d 303, 141 A.L.R. 87, our Supreme Court has refused to equate a good marital cause as a non-disqualifying reason to leave work.

■ 2) "Chewing again" was never enlarged to express a reprimand by showing the actual words used. Our criminal statutes penalize (1) the use in or about the family at home or in the hearing of females of abusive, insulting or obscene language, and (2) disturbing the peace of others by violent, profane, indecent, offensive or boisterous language. Code 1940, T. 14, §§ 11 and 119(1). See Stewart v. Department of Industrial Relations, 40 Ala.App. 383, 114 So.2d 274.

■ 3) Dividing the work up was certainly within managerial prerogative. Without showing oppression, as in Alabama Mills v. Brand, 251 Ala. 643, 38 So.2d 574, or reduction in earnings as claimed in Ganus, supra, this circumstance was not a cause to impel a reasonable man to give up work.

■ 4) Because White, the plant manager, got angry at Wells's knocking off at noon to go see Taylor was, under all the evidence, immaterial. It is clear that Taylor tried to persuade Wells to try staying at Evergreen. White, the circuit court concluded, could recommend dismissal. But Taylor was White's superior. Wells failed to show that he left with bona fide cause to believe that he had, in effect, been fired.

These incidents fail to afford objective grounds to show that the fault for the unemployment was such that a reasonable man would have quit, too.

■ All work with others implies a certain amount of give and take up and down the chain of command and with fellow workers on the same level. "Degradation," "sweating," "abuse," and other "oppression" are nouns colored with pejorative qualifica-

tions. We can only find their existence from evidence of objective facts. The McGuff rule does not allow the employee's subjective feeling state to become the statutory standard.

The application for rehearing is due to be granted and the judgment below is reversed.

Reversed and remanded.

PRICE, P. J., and CATES, J., concur.

JOHNSON, J., dissents.

JOHNSON, Judge (dissenting).

This is an appeal from a judgment of the Circuit Court of Covington County, Alabama, awarding appellee, Chester R. Wells, unemployment compensation. Appellee left his work with Evergreen Textiles, Inc., on March 2, 1961, and filed his claim for unemployment compensation on March 10, 1961. The Claims Examiner denied appellee's claim and the denial was upheld by the Appeals Referee on April 4, 1961. On November 6, 1961, the Board of Appeals reversed the rulings of the Appeals Referee and granted appellee's claim. The Circuit Court of Covington County, Alabama, affirmed the decision of the Board of Appeals and hence the appellant, Evergreen Textiles, Inc., prosecutes this appeal.

The entire evidence at the trial below was elicited from three witnesses: the appellee, Mr. Chester R. Wells; his immediate supervisor and plant manager, Mr. Russ White; and the Superintendent of Factories, Mr. James R. Taylor.

The court below was presented with one issue for determination, that being whether the appellee left his employment voluntarily without good cause connected with his work, so that he would be disqualified for unemployment compensation under Subsection B, of Section 214, Title 26, Code 1940. The court, sitting without a jury, ruled that the appellee left the employ of the appellant for good cause connected with his work and that he was entitled to a judgment for unemployment compensation.

In the trial court the appellee testified that he started to work for Alabama Textile Products Corp. in Andalusia in August of 1952 and was transferred to Evergreen Textiles, Inc., in June of 1959 as a sewing machine mechanic, where he worked until March 2, 1961, under the supervision of Mr. Russ White, the plant manager.

Appellee further testified that prior to his termination, he and Mr. White had differences over several things and stated, "he [White] seemed to always be on me about something that I was innocent of, and he could never see my side of the thing." Regarding details of differences between them, appellee testified in substance as follows:

That there was a valve which had been cut off in the men's room that controlled the cold water to the boiler and that Mr. White had come to him several times and asked him if he was sure that he had not done it. Wells stated that he didn't know who cut it off or why or anything about it. He said that, "He [White] didn't accuse me of it, but he done the next thing to it, and I had no reason whatsoever to touch the valve." Mr. White testified that he did question Wells about it but stated that, since it was his duty to investigate things of that nature, he questioned everybody that could have possibly been involved in it, and that the manner in which he questioned Wells about the valve was no different from that in which he questioned the others. On cross-examination, White stated that he couldn't remember asking Wells if he did it but said that he probably did.

Appellee testified that White once asked him if he went overseas during wartime and that he replied that he didn't, and that White then said, "Why didn't you go? Did you tamper with the records?" To this Wells replied that he was in no position to see or touch the records and added that he volunteered for military service and was available to be sent overseas or stay on this side. Wells said that White seemed to doubt him and asked for his serial number to prove that he was telling the truth. White

testified that he did not recall saying anything to the appellee about his overseas service but stated that he might have. He did recall a conversation with appellee regarding the fact that they both had been stationed at Napier Field near Dothan, Alabama. White testified that to his knowledge he did not ask for appellee's serial number but stated that it was possible that he might have.

Mr. Wells testified that on another occasion, he had been working continuously on a machine since early morning and at about 10:30 or 11:00 A.M. he stopped to go to the rest room and when he arrived there, he found the other plant mechanic and a borrowed mechanic smoking. Mr. White entered the rest room and "got all over" him but said nothing to the two other mechanics and left them in the rest room smoking. Wells further stated that on his way to pick up his tools to fix another machine, some operator stopped him at her machine for not more than one-half a minute to ask him a question, possibly about her machine, and Mr. White came up "ready to chew again", and that one thing brought on another and they had a few words right there. This occurred a few weeks before he left the company. White stated that he did not recall this particular instance but said that it was his responsibility to keep the machines running and that he frequently called a mechanic from one machine to repair another as urgency demanded. White contended that he didn't treat appellee different from any other mechanic in the plant and added that he liked him.

The appellee testified in connection with an incident concerning Union activities at Southern Coach and Body Works that he had a casual conversation with White in which White stated that he didn't believe that the Union would go in this other plant and that if it didn't go in there, he didn't believe it would ever go in their plant, but that if it did he thought their plant would be moved back to Andalusia rather than operate under a Union. The appellee agreed with this and when the same discussion

arose shortly thereafter during a break taken with two other employees, appellee made the same identical statement. Fifteen minutes later White came to him and asked why he had said that he wished the Union would come in their plant and that it would fall on its face. Appellee said he tried to reason with him and told him that he didn't say it and then requested that Mr. Taylor come over for him to talk with. The next day Mr. Taylor, Superintendent of Factories, and Mr. Wallace came over and called appellee to the office. Wallace had a little pad from which he read when asking him if he made a certain statement about the Union and Wells said that he didn't and asked Mr. Taylor if he could be transferred back to Andalusia. Mr. Taylor said that he had nobody to take Wells' place but that if he'd continue to do his work as well as he had been doing, his door would be open to him at any time. This was in the presence of White and Wallace. On the day he left it was his intention to talk with Taylor. At this meeting he said that he asked Mr. Taylor if he'd seen his record and that Taylor said that he hadn't but that he'd get it and call him back in the office as soon as he'd looked over it. In a few hours, Mr. Taylor called him back and said, "You had a mighty good record until Russ got hold of it", and told him to go back to work.

Regarding the above incident, Mr. White testified that he heard via "the grapevine" that appellee had said something to the effect that, "I wish the Union would come in and the Company would fall flat on its face." He stated that there were two men in the plant who were willing to face the appellee and tell him that he had made the statement. Mr. White said that this statement hurt him because he felt that he'd done his best for appellee and that they were trying to make a going concern of what they had. Mr. White said that he did not call the two men in to confront Wells with the accusation because he didn't see any reason in making a big point of it as long as Wells understood that it wasn't the thing to do. He added that Wells denied

having made the statement and offered to face any accusers.

Wells testified regarding an incident about splitting the units, that on the morning of the day he left White told him that he wanted to see him in the office. On the day before this he had told White that he planned to stay if he could stick it out. On this day, White said that he was tired of "this, that and the other" and that things had to "quieten down". Wells said that he agreed and that he said that they had to work together for both of their good. Then White said that he intended to split the unit and divide the machines between Wells and the other mechanic. Wells said that it seemed to him that this was putting him on the spot because he had had less experience than the other mechanic and White knew this. Wells said that he felt that he was getting machines which he wouldn't be able to keep up and he told White that he wanted to go and talk with Mr. Taylor and White told him that he couldn't go and that if he did, not to come back.

Appellee then went to see Mr. Taylor because Taylor had told him at an earlier meeting that he had an open-door policy and that he could bring his problems to him at any time. Mr. Taylor testified that appellee's leaving the plant to come to Andalusia was not a terminable offense and that Mr. White was without authority to discharge him for this reason.

White testified that appellee had complained to him that he couldn't get along with the other mechanic and stated that he felt that the other mechanic thought he himself was the head mechanic. Mr. White said that for several months he'd been "toying with the idea" of allowing Wells to have his own machines so he would feel that he was on equal footing with the other mechanic, and by checking with the supervisors and the individual operators he'd found that they considered Wells a good mechanic and felt that he was doing a good job. Mr. White said that when he split the department, he gave Wells the machines

that he knew he could repair. White stated that when Wells left his office he thought that everything was going to be all right but when he walked out onto the floor, Wells said, "I am through as of 4:00 today." White told Wells that he "hated that" and went back into his office. When he returned to the floor, Wells said he wasn't going to stay until 4:00 P.M., that he was leaving at noontime, and that he was going to see Mr. Taylor. White stated that he told Wells he didn't want him to go to see Taylor at that time but that he would make an appointment, according to a company policy because the plant is thirty miles from Andalusia. Mr. White testified that when appellee had turned his time in to him on Monday and said that he was going to wait, he told him that he couldn't get along with that mechanic, that he "had just reached the end of his row and life was too short to put up with it".

White testified that on Wednesday when Wells came to see him and told him that he'd changed his mind, he told him that he was real happy and that he was glad he was going to stay there and work the problem out. White said that it was the following day that he made the decision to give him the opportunity by splitting the plant up and letting him have his own responsibility and the other mechanic his.

The appellant contends that the appellee left his job voluntarily without good cause connected with his work, while the appellee claims that he was forced to leave as a result of the acts and harassment directed toward him by the plant manager.

We do not here purport by our holding to placate or pour balm upon the wounded feelings of any person, neither to arbite the disgruntled feelings of one who might suffer from a hyper-sensitiveness, the law with which we here deal not being purposed for such. Obviously, the trial judge below, in his evaluation of the testimony of the witnesses, looked for and failed to find proof that such condition existed.

The trial court concluded from the evidence that the conduct of the plant manager toward the appellee was so harassing and vexatious as to make his working conditions wholly intolerable and constituted good cause for his leaving the employ of the appellant. The record shows that the conduct of the plant manager toward the appellee was duly and timely reported to the manager's superiors, and although, after such notice, a duty to correct these conditions was incumbent upon the appellant, no satisfactory remedial measures were taken.

Where the testimony is taken ore tenus before the trial court, and the evidence is in conflict, the judgment of the lower court has the weight of a jury verdict, and such judgment will not be disturbed unless plainly contrary to the great weight of the evidence. Department of Industrial Relations v. Haynes, 259 Ala. 238, 67 So.2d 62; Alabama Mills, Inc., v. Brand, 251 Ala. 643, 38 So.2d 574; Zac Smith Stationery Co. v. Reynolds, 39 Ala.App. 389, 101 So.2d 573.

The grounds and cause for relief sought by the appellee are novel but I find no cause for a reversal of the judgment of the lower court, which I think should be affirmed.